In the Matter of: BEVILL, BRESLER & SCHULMAN ASSET MANAGEMENT CORPORATION, A New Jersey Corporation, Debtor-in-Possession,

v.

SPENCER SAVINGS & LOAN ASSOCIATION, Appellant in 88–6020.

In the Matter of: BEVILL, BRESLER & SCHULMAN ASSET MANAGEMENT CORPORATION, A New Jersey Corporation, Debtor-in-Possession,

v.

NIAGARA COUNTY SAVINGS BANK, Appellant in 88–6021.

In the Matter of: BEVILL, BRESLER & SCHULMAN ASSET MANAGEMENT CORPORATION, A New Jersey Corporation, Debtor-in-Possession

v.

CITY OF HARRISBURG, Appellant in 88–6022.

In the Matter of: BEVILL, BRESLER & SCHULMAN ASSET MANAGEMENT CORPORATION, A New Jersey Corporation, Debtor-in-Possession,

v.

CITY OF ALLENTOWN, Appellant in 88–6023.

Nos. 88–6020 to 88–6023.

United States Court of Appeals, Third Circuit.

Argued May 15, 1989.

Decided June 30, 1989.

Helen Davis Chaitman (argued), Ross & Hardies, Somerset, N.J., for appellant, Spencer Sav. & Loan Ass'n.

John J. Barry (argued), Clapp & Eisenberg, Newark, N.J., for appellant, Niagara County Sav. Bank.

Charles J. Ferry (argued), Rhoads & Sinon, Harrisburg, Pa., Alan M. Black (argued), Black, McCarthy, Usher, Eidelman & Feinberg, Allentown, Pa., for appellant, City of Allentown.

Jack M. Zackin (argued), Ravin, Greenberg & Zackin, P.A., Roseland, N.J., for appellee.

Frances R. Bermanzohn, Public Securities Ass'n, George J. Grumbach, Jr. Cleary, Gottlieb, Steen & Hamilton, New York City, for amicus curiae Public Securities Ass'n.

Before GIBBONS, Chief Judge, MANSMANN and ALDISERT, Circuit Judges

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The ultimate question for decision in these appeals by purchasers of federal government securities repurchase agreements ("repos"), is whether the Chapter 11 bankruptcy trustee of a bankrupt securities dealer may avoid certain pre-petition deliveries of securities to the purchasers.

The trustee contends the deliveries are avoidable as preferential transfers. The purchasers argue that the deliveries are protected by provisions of Chapter 11 designed to exempt participants in repurchase agreements from avoidance actions.

The appeals come to us in the form of two questions certified under 28 U.S.C. § 1292(b) and Rule 5, Fed.R.App.P. The questions require us to interpret provisions of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333. We must decide:

Whether section 546(f) of the Bankruptcy Code, 11 U.S.C. § 546(f), bars a Chapter 11 trustee from utilizing sections 547 and 548 to recover securities or their proceeds from a repo participant;

and

Whether section 559 of the Code, 11 U.S.C. § 559, bars a Chapter 11 trustee from claiming the proceeds of a repurchase agreement liquidated by a repo participant.

The district court answered both questions in the negative and found for the trustee. The repo purchasers have appealed. Jurisdiction was proper in the district court based on 28 U.S.C. § 1334(b). Jurisdiction on appeal is proper based on 28 U.S.C. § 1292(b). The appeals were timely filed under Rule 4(a), Fed.R.App.P. We answer these questions in the affirmative and will reverse the order of the district court.

## I.

The dispute here arises out of certain transfers of federal government securities from Bevill, Bresler & Schulman Asset Management Corporation (AMC) to appellants, Niagara County Savings Bank, City of Allentown, City of Harrisburg, and Spencer Savings & Loan Association. The transfers were made pursuant to repurchase agreements between the appellants and AMC. A standard repurchase agreement, commonly called a "repo," consists of a two-part transaction. The first part is the transfer of specified securities by one party, the dealer, to another party, the purchaser, in exchange for cash. The second part consists of a contemporaneous agreement by the dealer to repurchase the securities at the original price, plus an agreed upon additional amount on a specified future date. A "reverse repo" is the identical transaction viewed from the perspective of the dealer who purchases securities with an agreement to resell. *See* 11 U.S.C. § 101(40)–(41); *see also* S.Rep. No. 65, 98th Cong., 1st Sess. 44 n. 1 (1983).

AMC is one of several hundred secondary dealers in government securities. Secondary dealers are to be distinguished from primary dealers who purchase securities directly from the Federal Reserve. Savings and loan associations and local governments make up a significant number of customers engaging in repo transactions with secondary dealers. Other customers include money market and mutual funds, pension funds, insurance, financial and other corporations, and foreign investors.

Under the repurchase agreements here, the individual appellants agreed to purchase certain securities from AMC and simultaneously agreed to sell the securities back to AMC on an agreed upon date and for an agreed upon price. The appellants had entered into a type of repurchase agreement with AMC known as a "hold-in-custody" agreement. AMC initially re-

tained possession of the securities. Appellants did not take physical possession of the securities until several weeks after entering into the agreements. Less than ninety days later, AMC filed a voluntary petition for reorganization under Chapter 11. Appellee, Saul S. Cohen, was appointed trustee for AMC. After the Chapter 11 petition was filed, appellants liquidated the securities.

On April 8, 1985, the Securities and Exchange Commission filed a complaint against AMC and related individuals, alleging securities fraud. The complaint said that the dealer perpetrated a massive fraud upon its customers consisting of the sale of the same securities to multiple customers, and the sale of non-existent securities. According to the trustee, the claims of AMC's repo customers totaled approximately $207 million, and exceeded by over $140 million the value of the securities in AMC's possession as of the date the Chapter 11 commenced.

In April 1987, the trustee filed a complaint seeking to avoid the transfers of securities to the appellants, and to receive either a return of the securities, or award of equivalent money damages. The trustee alleged that AMC's pre-petition deliveries of the securities to each of the appellants were voidable under 11 U.S.C. § 547 ("... the trustee may avoid any transfer of an interest of the debtor in property—(4) made —(A) on or within 90 days before the date of filing of the petition ...") and 11 U.S.C. § 548 ("The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred in or written one year before the filing of the petition, if the debtor ... received less than a reasonably equivalent value in exchange....").

Appellants filed a joint motion to dismiss the complaint under Rule 12(b)(6), Fed.R. Civ.P., for failure to state a claim under which relief could be granted. The basis of the motion was that the trustee's preference actions were barred by 11 U.S.C. §§ 546(f) and 559.

11 U.S.C. § 546(f) provides:

Notwithstanding sections 544, 545, 547, 548(a)(2), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in § 741(5) or 761(15) of this title, or settlement payment, as defined in § 741(8) of this title, made by or to a repo participant in connection with a repurchase agreement and that is made before the commencement of the case, except under section 548(a)(1) of this title.

11 U.S.C. § 559 provides in pertinent part:

The exercise of a contractual right of a repo participant to cause the liquidation of a repurchase agreement because of a condition of the kind specified in section 365(e)(1) of this title shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title....

The district court denied the repo purchasers' joint motion to dismiss, holding that section 546(f) of the Code did not insulate the deliveries from avoidance under section 547 or 548 because the deliveries were not "settlement payments" within the meaning of section 741(8). The court also held that because the transfers were preferential, the repo purchasers had no rights under 11 U.S.C. § 559 to liquidate the securities and retain the proceeds. The district court issued an opinion from the bench, entered an order denying the motion to dismiss the complaint, and later certified the questions for an interlocutory appeal. We granted the appellant's petition to appeal from the interlocutory order of the district court.

It must be emphasized that this court is not reviewing all the proceedings that took place in the district court. We are called upon to decide only the issues presented by the certified questions.

In reaching its holding, the district court assumed that none of the securities in question had been "delivered" to the repo purchasers prior to the physical transfer of possession. The court based this assumption on its earlier conclusion that the securities had not been previously "delivered" within the meaning of the Uniform Com-

mercial Code (UCC). *See In the Matter of Bevill, Bresler & Schulman Asset Management Corp.,* 67 B.R. 557 (D.N.J. 1986) ("Test Cases"). In the Test Cases, the district court held, *inter alia,* that repos are purchases and sales of securities. *Id.* at 598. We accept that characterization.

The test cases also determined that a repo purchaser would be considered as "owning" the securities, even though the securities were in the custody of the seller, provided that those securities were "delivered" or "transferred" under the UCC. *Id.* at 603. If the district court had determined in the test cases that a UCC delivery had taken place and, that ownership of the securities here had passed prior to physical delivery, we would not be involved in the present litigation. For there could have been no preference, because there would have been no "antecedent debt" satisfied by the deliveries. Under such interpretation, the repo purchasers would not be considered creditors of AMC, but owners of the securities.

We will proceed in this case under the assumption that the district court was correct in its analysis of the ownership characteristics of these transactions. We emphasize, however, that this is an assumption we are constrained to make because of the limited nature of the review of certified questions. We specifically do not meet the question whether the district court erred in its determination of what constitutes transfer of ownership under repo market practices. We decide only whether the district court misinterpreted and misapplied sections 546(f) and 559 of the Code.

Appellants argue that the district court decision was a restrictive and erroneous interpretation of "settlement payment" as set forth in section 546(f). Appellants also contend that the district court decision failed to recognize the flexible and varied settlement practices in the government securities market, an understanding which is key to the proper interpretation and application of the statutory sections at issue.

## II.

The issues before us are questions of first impression involving statutory interpretation as to which this court has plenary review. *Creque v. Luis,* 803 F.2d 92, 93 (3d Cir.1986).

## III.

Before proceeding to the controlling statutes, we, as did Congress, deem it advisable to emphasize the important role that repo transactions have in our nation's economy. In 1983, it was estimated that the aggregate *daily* volume of repo transactions amounted to several hundred billion dollars. S.Rep. No. 65, 98th Cong., 1st Sess. 45 (1983) ("1983 Senate report"). More recently, it has been reported that the aggregate daily repo volume during the *week* of November 9, 1988, was approximately $600 billion. Br. for amicus curiae (Public Securities Assoc. (PSA)) at 10 n. 10 (citing Fed.Res.Bull. at A32 (Fed.1989) (Table 1.43)). By contrast, the record volume of stock exchange and over-the-counter trades during the *week* of October 26, 1987 (when stock trades for the week of October 19, 1987 settled) has been estimated to have been less than $200 billion. *Id.* (citing Division of Market Regulation, U.S. Securities and Exchange Commission, *The October 1987 Market Break at 10–1,* appearing in, *The Stock Market Crash, October 19, 1987: Reports, Studies and Testimony,* Vol. 1, (1980)). Repos involve large amounts of money (agreements are usually for $500,000 or more), are typically of limited duration, often for just one night, and are usually closed by an oral agreement subject to written confirmation. *See SEC v. Miller,* 495 F.Supp. 465, 469 (S.D.N.Y. 1980).

The repo market is used by the Federal Reserve System to help execute monetary policy, and serves to finance the national debt at the lowest possible cost. Repos are an attractive cash-management investment for businesses, state and local governments, and financial institutions.

The Federal Reserve uses repos and reverse repos to meet temporary needs for reserves by purchasing securities under re-

verse repos, or to counter temporary excesses of reserves by selling securities under repos. Primary dealers act in effect as first-tier underwriters of new issuances of U.S. Treasury securities. Because primary dealers do not have the funds to purchase new issuances outright, they finance a major portion of their purchases by selling the securities under repos to secondary dealers, such as AMC, who in turn finance their purchases by selling the securities under repos to institutional and other customers. *In re Bevill, Bresler & Schulman Asset Management Corp.*, 67 B.R. 557, 567 (D.N. J.1986). Because the cost of financing United States Treasury securities under repos is usually less than the cost of other financing sources (such as bank loans), the repo market reduces the cost of distributing Treasury securities.

The repo market also enhances the liquidity of mortgage-backed securities. *Id.* at 567–68. "The common element in all these extensive uses of repo agreements is liquidity. Without that characteristic, the repurchase agreement would not serve the function that it now does." *Bankruptcy Law and Repurchase Agreements: Hearings on S. 445 Before the Subcomm. on Monopolies and Commercial Law of the Senate Comm. on the Judiciary*, 98th Cong., 1st Sess. 306 (1983) (Statement of Peter Sternlight, Executive Vice President, Federal Reserve Bank of New York).

## IV.

It is important to understand how securities are delivered under traditional repo practices. In proposing government securities broker-dealer regulations under the Government Securities Act of 1986, 15 U.S. C. § 78*o*–5, the Treasury Department recognized that typically a repo may be structured in one of three ways. First, the agreement may require that the securities be delivered to the purchaser, or to the purchaser's designated custodial bank. This is often called a "deliver-out repo." Second, the agreement may provide for delivery to a third party, usually a custodial bank, holding the securities for the benefit of both parties. This method is often called a "tripartite repo." A third method of delivery, known as "hold-in-custody (HIC) repo", is the type of transaction implicated here. In a HIC repo the dealer may retain control of the securities and earmark them on its own books as securities subject to a specific repo transaction. Under the latter arrangement, the dealer usually will instruct its clearing bank to segregate the securities subject to repurchase from the securities in the dealer's clearing account. However, the clearing bank will not necessarily be advised of the identity of the purchaser of specific repo securities. Under these circumstances, the securities will be subject only to the control of the dealer and its clearing bank. 52 Fed.Reg. 5671 (1987). As indicated in a 1987 Securities and Exchange Commission staff study on the repo market, some broker-dealers find it advantageous to pay a slightly higher repo rate if the buyer does not require that securities be physically delivered, or that ownership be transferred over the wire (book-entry) in the case of certificateless securities. Instead, the selling broker-dealer sends a confirmation to the purchaser naming the certificates that are subject to the repo and indicating how they are segregated for safekeeping. Br. for appellant Niagara County Savings Bank (citing *The Use of Repurchase Agreements by Broker–Dealers*, SEC Directorate of Economic and Policy Analysis 18 (Dec.1987)).

Furthermore, in a HIC repo, the dealer may commingle the purchaser's securities with its own securities during the day and use such securities to facilitate deliveries of securities to third parties if necessary. The dealer's use of securities in this way "appears to be a common practice in the government securities market." 52 Fed. Reg. 5672 (1987). The Treasury Department has recognized that HIC repos represent "the greatest potential for loss on the part of the investors since the securities purchased remain in the control of the seller." *Id.* at 5671.

## V.

Although we are the first appellate court to interpret and apply these provisions, we

are fortunate that there is substantial legislative history to assist us in ascertaining the intent of Congress. To place the certified questions in proper perspective, it is first necessary to understand the history of the various amendments to the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598.

### A.

Although our major concern is with the 1984 amendments to the Bankruptcy Reform Act, we must first consider the 1982 amendments. At the time of their passage, Congress was concerned about the volatile nature of the commodities and securities markets, and decided that certain protections were necessary to prevent "the insolvency of one commodity or security firm from spreading to other firms and possibly threatening the collapse of the affected market." H.Rep. No. 97–420, 97th Cong., 2d Sess. 1 (1982) ("1982 House report"), U.S.Code Cong. & Admin.News 1982, p. 583. As stated in the House Report on the 1982 amendments:

> The Bankruptcy Code now expressly provides certain protections to the commodities market to protect against such a 'ripple effect.' One of the market protections presently contained in the Bankruptcy Code, for example, prevents a trustee in bankruptcy from avoiding or setting aside, as a preferential transfer, margin payments made to a commodity broker....

*Id.*

Congress wanted to go further to protect margin payments and settlement payments made by and to participants in the securities market generally. Accordingly, it added a new subsection to 11 U.S.C. § 546:

> Notwithstanding sections 544, 545, 547, 548(a)(2), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 741(5) or 761(15) of this title, or settlement payment, as defined in section 741(8) of this title, made by or to a commodity broker, forward contract merchant, stockbroker, or securities clearing agency, that is made before the com-

mencement of the case, except under section 548(a)(1) of this title.

11 U.S.C. § 546(e). It will be seen shortly that this section was the model upon which section 546(f) of the 1984 amendments was based.

### B.

After the 1982 amendments were in effect, Congress became concerned that the amendments did not "adequately [ ] protect liquidations of repos in the event of the insolvency of a dealer or other participant in the repo market, even though the principal objective of Public Law 97–222 [the 1982 amendments] was to prevent the insolvency of one commodities or securities firm from spreading to other firms and possibly threatening the stability of the affected market." 1983 Senate report at 47. Congress noted: "The repo market serves a crucial function for both parties to the repo transaction. The country's major institutional and fiduciary investors make heavy use of repos. For these investors, including such entities as state and local governments, public and private pension funds, money market and other mutual funds, banks, thrift institutions, and large corporations, repos have become a vital tool of cash management." *Id.* at 45. Moreover, Congress stated, "The repo is particularly well-suited to the needs of these investors. Receipts of taxes and the proceeds of bond issues in the case of state and local governments, cash flows from corporate operations, and liquidity needs of thrift institutions and money market funds often fail to coincide with the planned expenditures of such funds, thereby creating the need for such entities to invest idle funds for short periods in as risk-free a manner as possible." *Id.* Accordingly, Congress came ·to the decision that:

> The effective functioning of the repo market can only be assured if repo investors will be protected against open-ended market loss arising from the insolvency of a dealer or other counter-party in the repo market. The repo market is as complex as it is crucial. It is built upon transactions that are highly interrelated. A collapse of one institution involved in

repo transactions could start a chain reaction, putting at risk hundreds of billions of dollars and threatening the solvency of many additional institutions. *Id.* at 47.

The uncertainty was highlighted when Lombard–Wall, Inc., filed a Chapter 11 bankruptcy petition in the Southern District of New York in August, 1982. A bench decision in the Lombard–Wall case held that the holder of securities subject to a repurchase agreement was subject to the automatic stay provision of the Code, and that the holder was precluded from closing out its position with the debtor without approval of the court. *Lombard–Wall Inc. v. Columbus Bank & Trust Co. (In re Lombard–Wall Inc.),* No. 82 B 11556 (Bankr.S.D.N.Y. Sept. 16, 1982). This case made clear the risks to the repo market created by the Code's automatic stay and avoidance provisions. It also demonstrated that the 1982 amendments were not sufficient in scope to protect the market from major dislocations caused by the bankruptcy of market participants. Under its holding, the repo participant would be subjected "both to the unexpected inability to liquidate securities it holds and to the risk of capital loss should unfavorable interest rate changes occur; these risks impair the qualities that are the essence of the appeal of repo agreements." *Bankruptcy Law and Repurchase Agreements: Hearings on H. 2852 and H. 3418 Before the Subcommittee on Monopolies and Commercial Law of the House Comm. on the Judiciary,* 98th Cong., 2d Sess. 72 (1984) ("House hearings") (letter of Hon. Paul A. Volcker, Chairman, Federal Reserve, to Hon. Peter W. Rodino, Jr., Chairman, House Judiciary Committee).

Congress, the Board of Governors of the Federal Reserve, the Public Securities Association, the Investment Company Institute and others, were concerned that if *Lombard–Wall* became the law governing repo transactions, the failure of one repo dealer, and the consequent inability of repo participants to promptly liquidate their investments to obtain cash to meet obligations, could have a ripple effect throughout the country's financial markets, causing an otherwise isolated financial problem to spread to many other entities. Congress recognized:

> The bankruptcy of a repo participant could result in possible substantial losses to investors, large and small, and also imposes at least the possibility of liquidity and solvency risks on the entire market, since parties holding repos with the bankrupt might be unable to promptly liquidate their investments, and in turn meet their obligations to third parties.

House hearings at 37.

> The certainty and fluidity needed by professionals on both sides of the transactions is of such importance that one debtor's filing of a petition should not be permitted to impair the functioning of the market as a result of the Code's automatic stay, or have the integrity of contract relationships upset by the Code's avoidance provisions.

*Id.* at 517.

Congress determined to correct these "uncertainties" by amending the Code to "ensure there is no question that repo participants are afforded the same treatment with respect to the stay and avoidance provisions of the Code in connection with repurchase agreements" as is afforded other market participants under the 1982 amendments. 1983 Senate report at 44–45.

The congressional response was a series of amendments, effective in 1984, now known as the "Repo Amendments": sections 546(f) and 559 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.,* together with sections 101(41), 362(b)(7) and 548(d)(2)(C).

### C.

In the amendments, Congress provided not only that the repo participant could liquidate its securities, but also that it could keep the proceeds of that liquidation to the extent of its contract price. Congressional understanding of this issue is demonstrated by the following colloquy. Peter W. Rodino, Jr., Chairman of the House Committee on the Judiciary, posed the following question to Paul A. Volcker, Chairman of the Federal Reserve System:

A representative of the National Bankruptcy Conference has suggested that ... [the proposed bill which] would authorize the liquidation of a repurchase agreement during the bankruptcy of a counterpart, should be subject to the debtor's right to use the cash collateral created by the exercise of such a provision under existing section 363 of the Code. Would the Federal Reserve support legislation containing such a provision?

The Federal Reserve responded that it would not support such a provision. Preston Martin, on behalf of the Federal Reserve, responded as follows:

> The essence of a repurchase agreement is the liquidity afforded by the ease with which the underlying security can be converted to cash in the marketplace. Permitting liquidation of a security by a repo holder but retaining those funds for the debtor's use rather than releasing them to the holder eliminates this liquidity. Such a restriction would be contrary to the intent of ensuring a stable and efficient market for repurchase agreements.

House hearings at 102–104.

Similarly, there was testimony from the Public Securities Association (PSA). PSA is a not-for-profit association that represents approximately 300 banks and broker-dealers that underwrite, trade and distribute federal government and agency securities, mortgage-backed and municipal securities. All of the primary dealers in federal government securities, as recognized by the Federal Reserve Bank of New York, are members of PSA. Robert C. Brown, Chairman of the PSA Board, explained that:

> The ability of the repo market to serve all of its functions in the money market depends upon a high level of certainty about the ability of the various repo participants to close out repo transactions in the event of insolvency of the other party to the transaction, and to assure that repo transaction payments previously received from that party will not be re-

claimed by the trustee under the Bankruptcy Code.

*Id.* at 83.

## VI.

With the legislative history of the 1982 and 1984 amendments as our guide, we now turn to the interpretation of section 546(f) of the 1984 amendments. As stated before, section 546(f) provides:

> Notwithstanding §§ 544, 545, 547, 548(a)(2), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in § 741(5) or § 761(15) of this title, or settlement payment, as defined in § 741(8) of this title, made by or to a repo participant in connection with a repurchase agreement and that is made before the commencement of the case, except under § 548(a)(1) of this title.

section 741 provides in pertinent part:

> (5) "margin payment" means payment or deposit of cash, a security, or other property, that is commonly known to the securities trade as original margin, initial margin, maintenance margin, or variation margin, or as a mark-to-market payment, or that secures an obligation of a participant in a securities clearing agency; ...
>
> (8) "settlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.

At issue in this case is whether AMC's pre-petition transfer of the securities to appellants constituted a "settlement payment" as contemplated by Congress.

### A.

"Where, as here, the question is one of statutory construction, we begin with the language of the statute. *See, e.g., Blum v. Stenson,* 465 U.S. 886, 896 [104 S.Ct. 1541, 1547–48, 79 L.Ed.2d 891] (1984); *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108 [100 S.Ct. 2051, 2056, 64 L.Ed.2d 766] (1980)," *Mansell v.*

*Mansell,* — U.S. —, 109 S.Ct. 2023, 104 L.Ed.2d 675 (1989). In interpreting section 546(f), we start first with its critical language: "settlement payment." "Payment" is defined as "paying or being paid," *Webster's New World Dictionary of the American Language* (Second college ed. 1970). "Pay" means "1. to give (a person) what is due ... 4. to discharge or settle (a debt, obligation, expenses, etc.) by giving something in return." *Id.* The district court interpreted "settlement payment" in accordance with a strictly monetary view of "payment," and construed it to mean those funds paid by or credited to the purchaser at the moment the repo agreement was entered into without respect to any delivery of the securities. The court then looked at definitions of "settlement" applicable to orthodox corporate securities transactions between a stockholder and a customer, and concluded that "settlement payment" is a transaction that is, and indeed must be, consummated within five days of the agreement to purchase. In so doing, the court equated "settlement payment" contained in section 546(f) with "settlement date" as commonly understood in traditional corporate securities stockholder-purchaser transactions. The district court considered as authority for what constitutes a settlement payment for purposes of the Code, a treatise definition of "settlement day" peculiar to routine trades in the securities market, *i.e.,* the day normally five days after a trade is executed. In this case the deliveries took place more than five days after the execution of the agreement.

The district court concluded that the actual deliveries of the securities—at a later date and within the 90 days of the petition filing—did not constitute part of the "settlement" because they occurred after the traditional "settlement day." Under this view they did not constitute a "settlement payment" and did not bar the trustee from avoiding the transfer. We believe that the district court erred in both its interpretation of the critical phrase and the application of its definition.

## 1.

"[I]n expounding a statute, we [are] not ... guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Massachusetts v. Morash,* — U.S. —, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1989) (citing *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 51, 107 S.Ct. 1549, 1555, 95 L.Ed.2d 39 (1987)).

Impressive authorities have warned judges that they must ascertain meaning from more than the actual language of a statute. Cardozo wrote that "[w]hen things are called by the same name it is easy for the mind to slide into an assumption that the verbal identity is accompanied in all its sequences by identity of meaning." *Lowden v. Northwestern National Bank & Trust Co.,* 298 U.S. 160, 165, 56 S.Ct. 696, 699, 80 L.Ed. 1114 (1936). Holmes told us: "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne v. Eisner,* 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918). Learned Hand said, "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

Ascertaining the legislative intent behind the words of a statute is a task somewhat akin to pinpointing the intent of a testator or the intent of disputing parties to a contract. Proper judicial construction, in the modern view, requires recognition and implementation of the underlying legislative purpose, *Train v. Colorado Pub. Interest Research Group, Inc.,* 426 U.S. 1, 9–10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976), and the judge, the theory holds, must accommodate the societal claims and demands reflected in that purpose. To accomplish this task, as Justice Roger J. Traynor put it, we need "literate, not literal" judges, lest a court make a construction within the stat-

ute's letter, but beyond its intent. Traynor, *Reasoning in a Circle of Law,* 56 Va.L.Rev. 739, 749 (1970).

#### 2.

We believe that this is a classic instance where a court is required to ascertain the precise congressional intent represented by the words, as well as their literal meaning. This is because two important national legislative policies are on a collision course here, and it behooves the courts of the Third Article to decide which policy Congress intended must yield. On the one hand is the bankruptcy policy giving broad powers to a trustee to avoid transactions taking place within 90 days prior to the petition filing. This is reflected in sections 547 and 548 of the Code, giving the trustee power to avoid preferential or fraudulent transfers.

On the other hand, the stated intent of the 97th Congress in the Bankruptcy Amendments of 1982 and the 98th Congress in the Bankruptcy Act of 1984 was to remove the right of the trustee to avoid transactions under certain circumstances. Thus, in the 97th Congress, House Judiciary Committee Chairman Rodino indicated that the 1982 amendments were designed in cases of securities in general to "ensure that the avoiding powers of a trustee are not construed to permit margin or settlement payments to be set aside except in cases of fraud [by the purchaser.]" 1982 House report. The 98th Congress specifically addressed the problems of the repo market, which it acknowledged as serving a crucial aspect of the country's major institutional and fiduciary interests. It sought to avoid a domino effect whereby "the collapse of one institution involved in repo transactions could start a chain reaction, putting at risk hundreds of billions of dollars and threatening the solvency of many additional institutions." *Id.* at 47.

#### 3.

We, therefore, enter into our task of interpreting the language of the relevant statutes with the stated congressional purposes as the polestar, or more elegantly, as

Polaris, the North Star, to guide us. We are to decide whether we accept the district court's interpretation of "settlement payment" as a transaction that is completed within five days of the original agreement, or whether "settlement payment" contemplates the delivery of securities to a repo purchaser, even if delivery takes place beyond the five-day period or within the 90–day period described in section 547.

#### B.

Appellants argue, and we agree, that the district court did not interpret "settlement payment" in accordance the realities of the repo market or in accordance with congressional intent. Section 741(8) of the 1982 amendments gives an extremely broad definition of "settlement payment":

> "Settlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.

It is well understood in the securities market that the settlement process does not end with the purchaser's payment for the securities; rather, the process continues on to include the record transfer of the securities. Section 17A(a) of the Securities Exchange Act of 1934, ("1934 Act") 15 U.S.C. § 78q–1(a), mandating the establishment of a national securities clearance and settlement system, specifically recognizes that the transfer of record ownership of securities is an integral element in the securities settlement process. Section 17A(a)(1)(A) of the 1934 Act provides as follows:

> The Congress finds that—(A) The prompt and accurate clearance and *settlement* of securities transactions, *including the transfer of record ownership and the safeguarding of securities and funds related thereto,* are necessary for the protection of investors and persons facilitating transactions by and acting on behalf of investors.

15 U.S.C. 78q–1(a)(1) (emphasis supplied).

When the congressional purpose of the 1984 Repo Amendments is properly evalu-

ated—insuring the liquidity of repurchase agreements—it is clear that "settlement payment" does not only mean payment of cash to the dealer by the purchaser, but also encompasses transfer of the purchased securities to the purchaser from the dealer. If there is any facial ambiguity in the language of section 741(8), and we confess to this possibility, that ambiguity should be properly dispelled by the definition of "margin payment":

> "margin payment" means payment or *deposit of* cash, *a security*, or other property, that is commonly known to the securities trade as original margin, initial margin, maintenance margin, or variation margin, or as a mark-to-market payment, or that secures an obligation of a participant in a securities clearing agency.

11 U.S.C. § 741(5) (emphasis supplied). A margin payment may be said to be a "similar payment commonly used in the securities trade" as set forth in the definition of "settlement payment" in section 741(8).

Moreover, in responding to the importance of liquidity expressed by the Federal Reserve and the Public Securities Association, Congress concerned itself with limiting the trustee's authority in two interrelated, but discrete, areas—avoiding a repo transaction and staying the completion of the repo agreement. In the amendment providing for relief from stays, Congress used language that is extremely helpful in understanding what it meant by "settlement payment." In its 1984 "stay" amendment, 11 U.S.C. § 362(b)(7), Congress set forth a more detailed explanation of "settlement payment" than it had in the 1982 enactment. The statute prohibits a stay of:

> ... the setoff by a repo participant ... of a claim against the debtor for a margin payment ... or settlement payment, as defined in section 741(8) of this title, arising out of repurchase agreements against cash, securities, or other property held by or due from such repo participant to margin, guarantee, secure or settle repurchase agreements.

From all of this, two significant observations emerge: Congress intended (1) that the phrase "settlement payment" include transfer or deposit of "securities, or other property held by or due from such repo participant," and (2) that the same interpretation of "settlement payment" be applied in prohibiting avoidance as well as prohibiting the operation of the traditional stay order.

Such an interpretation of "settlement payment" is consistent with two basic intentions of Congress: that a "settlement payment" may be the deposit of cash by the purchaser or the deposit or transfer of the securities by the dealer, and that it includes transfers which are normally regarded as part of the settlement process, whether they occur on the trade date, the scheduled settlement day, or any other date in the settlement process for the particular type of transaction at hand. Congress would not have found it necessary in the 1982 amendments to provide such an expansive list of possible types of settlement payments in section 741(8) if it intended that all of them would in effect have to have been made on or before a scheduled "settlement day" in order to qualify under the definition.

Moreover, the unique character of the settlement process in government securities repo transactions, particularly HIC repo transactions, as involved here, must be taken into consideration. Settlement payments in any kind of repo transaction may embrace transfer of securities against transfer of funds and are made on whatever date may be agreed upon by the parties to the transaction; they may be the same day as the trade, the next day or some future date depending upon the parties' needs in the particular transaction. The repo participants here, in requesting the delivery of securities subject to a HIC repo, asked in effect to have the transaction converted from a HIC repo to a deliver-out repo, so as to obtain physical delivery of the underlying securities from AMC. The physical delivery of the securities did in fact convert the basic character of the repo transaction from a HIC repo to a deliver-out repo. Delivery of the securities was a part of the settlement process, and thus constitutes a "settlement payment" for purposes of section 546(f). We hold that

section 546(f) of the Bankruptcy Code bars a Chapter 11 trustee from utilizing sections 547 and 548 to recover the federal government securities transferred to the repo participants in this case.

Because this was a valid transfer exempt from the Code's avoidance provisions, the appellants were protected by 11 U.S.C. § 559:

> The exercise of a contractual right of a repo participant to cause the liquidation of a repurchase agreement because of a condition of the kind specified in section 365(e)(1) of this title shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title ...

The trustee's right to any of the proceeds of the liquidation is limited to the extent set out in section 559.

## VII.

In enacting the 1984 repo amendments, Congress recognized that repo transactions provide one of the major mechanisms for limited term investment in the country's financial system. As we have previously recognized in Part III, the aggregate daily amount of repo transactions at the time of enactment was estimated at several hundred billion dollars. Securities that are the subject of repos include a substantial part of the present approximately 2.7 trillion dollar federal debt. *Survey of Current Business,* 14 (Dec.1988). From an examination of the Senate and House reports, we have concluded that Congress reacted to the concerns of the Federal Reserve that if repo financing became uncertain or more costly due to adverse interpretations of the Code, the distribution system for newly-issued government securities and the federal government's ability to raise funds in a cost effective manner would be adversely affected.

The essential attribute of repos is liquidity—the assurance that the repo will be completed without delay. Absent the 1984 amendments, the automatic stay and avoidance provisions could inhibit the orderly execution of repos in the event of a repo dealer's bankruptcy, thereby subjecting the repo participant to market risk and obstructing the requirement of liquidity. Repo participants would not receive funds as expected (or the return of their paid-for securities in the case of reverse repo participants), which would require them either to default on their commitments to third parties or borrow funds (if possible), to fulfill these commitments. The ability of the Federal Reserve to act promptly and in the large volumes necessary to achieve monetary policy objectives would be severely limited. And the federal government's ability to finance the public debt at cost effective rates of interest would be substantially impaired. These considerations cannot be ignored.

## VIII.

In sum, we answer in the affirmative the two questions certified to us by the district court which it answered in the negative. Accordingly, the judgment of the district court will be reversed and the proceedings remanded to the district court with direction to grant the motion of the appellants for judgment in their favor under Rule 12(b)(6), Fed.R.Civ.P.