**In re GRAFTON PARTNERS, L.P., a California Limited Partnership, and its Affiliates, Debtors.**

**Richard M. Kipperman, Chapter 7 Trustee, Appellant,**

**v.**

**Circle Trust F.B.O., Michele Montano, n/k/a Circle Trust, Trustee for The Stable Value Fund, Appellee.**

**BAP No. SC–04–1028–KMOS.**
**Bankruptcy No. 01–10606–H7.**
**Adversary No. 02–90555.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted July 30, 2004.

Filed Feb. 17, 2005.

Ali M.M. Mojdehi, Baker & McKenzie, San Diego, CA, for Richard M. Kipperman, Chapter 7 Trustee.

Margaret M. Mann, Heller, Ehrman, White & McAuliffe, San Diego, CA, for Circle Trust F.B.O. Michelle Montano, nka Circle Trust, Trustee for the Stable Value Fund.

Before: KLEIN, MONTALI, and SMITH, Bankruptcy Judges.

## OPINION

KLEIN, Bankruptcy Judge.

The federal securities laws intersect with the Bankruptcy Code in this appeal arising from a "Ponzi scheme" that collapsed into federal criminal prosecutions and bankruptcy.

The essential question is whether nonpublic transactions in illegally unregistered securities can be the subject of "settlement payments" that are "commonly used in the securities trade" within the meaning of 11

U.S.C. § 741(8). If so, then such payments made to appellee "financial institution" are immunized from trustee avoiding powers by 11 U.S.C. § 546(e).

Before the collapse, appellee, the trustee of a pooled investment fund, sought to withdraw all $29 million of capital contributions it had made to a limited liability company that had funded the Ponzi scheme, the funds having been raised in violation of registration and anti-fraud provisions of the Securities Act of 1933 and Securities Exchange Act of 1934.

Although appellee actually withdrew $22 million before the collapse, the LLC's chapter 7 trustee attacked only the $4 million transfer that was received 89 days before bankruptcy, arguing it was a preference to be retrieved and shared with fellow fraud victims who did not withdraw before the collapse.

The trustee appeals the ruling that the withdrawal of capital was a "settlement payment" that is "commonly used in the securities trade" made to a "financial institution" and, hence, immune from recovery per 11 U.S.C. § 546(e). We hold that non-public transactions in illegally unregistered securities are not "commonly used in the securities trade" and REVERSE.

## FACTS

PinnFund USA, Inc. ("PinnFund") engaged in the mortgage banking business, originating, purchasing, and selling so-called non-conforming, or sub-prime, mortgage loans in California.

Funds to make the loans came from investors in two limited partnerships (Allied Capital Partners and Grafton Partners) and Six Sigma, LLC ("Six Sigma"), that were formed for that purpose.

These funding entities were managed by Peregrine Funding, Inc. ("Peregrine"), owned by James L. Hillman and operated by Hillman and Piotr Kodzis, which acted as general partner to the partnerships and as managing member of Six Sigma.

PinnFund agreed, under its Spot Loan Funding Agreement, to pay the funding entities a premium return for the use of their capital: "interest" at 10 percent; plus a share of participation fees on sales of loans. This compensation, according to the Subscription Agreement, was expected to withstand usury attack because "the transactions are more appropriately characterized as either: (i) agreements to advance money in exchange for a share in profits; or (ii) loans in which the amount of the interest payment is contingent upon events within the borrower's control."

Although the Spot Loan Funding Agreement required that PinnFund maintain the investors' funds in a trust account to be used solely to fund loans, about $100 million of the $276 million raised was diverted to pay PinnFund's operating losses and to finance lavish lifestyles for insiders.

The Ponzi scheme ended in 2001 when the Securities and Exchange Commission ("SEC") took action leading to a receivership and to criminal prosecutions of the principals, who eventually confessed to running PinnFund as a Ponzi scheme.[1]

---

1. The prosecutions are described in a published decision:

In March 2001, PinnFund went into receivership by order of this Court upon a motion by the United States Securities and Exchange Commission ("SEC"), based upon allegations that investors were being defrauded and their funds improperly distributed. *See SEC v. PinnFund USA, Inc., Peregrine Funding, Inc., et al. [Allied Capital Partners, Grafton Partners, Six Sigma, LLC A/K/A 6 Sigma LLC, Michael J. Fanghella, James L. Hillman, Reliance Holdings, LLC, Kelly Cook A/K/A Kelly Jaye A/K/A Kelly Spagnola]* .... Since that time, PinnFunds's Chief Executive Officer Michael J.

What made it a Ponzi scheme was that much of the return provided to investors monthly under the guise of "interest" or participation fees actually came from the corpus of invested funds, rather than from profits derived from business activity.[2] In such a scheme, it was inevitable that Pinn-Fund would run out of funds and plunge PinnFund, Peregrine, and the funding entities into bankruptcy. It was only a question of time.

One of the funding entities, Six Sigma, was a California limited liability company formed in 1999. Its operating agreement made Peregrine (controlled by Hillman) its manager, limited its business to providing funds for PinnFund loans, and precluded LLC members from participating in management.

Membership in Six Sigma was limited to 99 "qualified purchasers," as defined by the Investment Company Act of 1940. Six Sigma took the position that no registration statement under the Securities Act of 1933 was required. The membership interests could not be transferred without permission of the manager, who could involuntarily redeem an interest in order to permit Six Sigma to continue to qualify as a partnership for purposes of taxation or to comply with securities laws.

Each Six Sigma member had a capital account, consisting of the sum of that member's capital contributions and pro rata share of profits and losses. The capital account, adjusted monthly, would rise or fall to reflect the fortunes of the business.

The operating agreement provided that a member could withdraw from Six Sigma by withdrawing its entire capital account on 60–day notice ("or any lesser period at the Manager's sole and absolute discretion").

Appellee Circle Trust Company ("Circle Trust"), a member of Six Sigma, is a limited purpose trust company chartered by the State of Connecticut to provide fiduciary services only. It may not accept deposits and is not insured by the Federal Deposit Insurance Corporation. It provides investment management, trust, custody, and administrative services.

Circle Trust's Six Sigma capital contributions totaled $29 million, made as trustee of the Stable Value Plus Fund. Circle Trust represented to Six Sigma that it was

---

Fanghella, its President and Chief Operating Officer Keith G. Grubba, and its Chief Financial Officer John D. Garitta have all pled guilty to criminal charges arising out of their roles at PinnFund, admitting that they operated PinnFund as a massive Ponzi scheme involving hundreds of millions of dollars of investor funds. *See United States v. Fanghella,* ...; *United States v. Grubba,* ...; and *United States v. Garitta,* .... *United States v. Kodzis,* 255 F.Supp.2d 1140, 1142 (S.D.Cal.2003) (docket nos. omitted)

**2.** The term "Ponzi scheme" is the legacy of what Chief Justice Taft described as "the remarkable criminal financial career of Charles Ponzi." *Cunningham, Trustee of Ponzi v. Brown,* 265 U.S. 1, 7, 44 S.Ct. 424, 68 L.Ed. 873 (1924); *see* D. DUNN, PONZI: THE BOSTON SWINDLER 247–48 (1975).

The Ninth Circuit describes the classic Ponzi scheme as:

A Ponzi scheme is a fraudulent arrangement in which an entity makes payments to investors from monies obtained from later investors rather than from any "profits" of the underlying business venture. The fraud consists of funnelling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment.

*Wyle v. C.H. Rider & Family (In re United Energy Corp.),* 944 F.2d 589, 590 n. 1 (9th Cir.1991); *Plotkin v. Pomona Valley Imps., Inc. (In re Cohen),* 199 B.R. 709, 717 n. 9 (9th Cir. BAP 1996).

acquiring its interest directly and without a compensated intermediary.

When Circle Trust decided to withdraw from Six Sigma, allegedly after doing "due diligence,"[3] it gave notice, by letter of September 28, 2000, to James L. Hillman and Peregrine, of its request to withdraw "all of its capital account in Six Sigma, LLC ('Capital Account'), as of the earliest permitted date." Three capital account payments ensued, totaling $22 million of the $29 million invested: (1) $10 million wire-transferred November 1, 2000, the 60–day notice requirement having been waived; (2) $8 million by check of December 1, 2000; and (3) $4 million by check dated January 2 and honored January 4, 2001, by the drawee bank.

When Six Sigma filed its chapter 7 case, Circle Trust still had $7 million of capital on the books, on which it received "interest" during 2001: $160,875.09 (January 10); $100,642.82 (February 12); and $98,273.73 (March 12).

The total "interest" that Circle Trust had received monthly from Six Sigma on account of capital contributions was $3,989,041.64. The source of funds to pay such "interest" was, consistent with the fraud's status as a Ponzi scheme, the capital provided by the LLC and the limited partnerships.

Six Sigma and the limited partnerships filed chapter 7 cases in the Northern District of California on April 2, 2001, twelve days after the SEC sued. They were transferred to the Southern District of California, where they were consolidated under the name "Grafton Partners, LP, and Affiliated Entities," with Richard Kipperman as case trustee.

The trustee sued Circle Trust to avoid and recover the $4 million transferred January 4, 2001, as a preference.

Circle Trust moved for summary judgment, arguing that the partial withdrawal was a "settlement payment" as defined by 11 U.S.C. § 741(8) and, thus, was immune from avoidance as a preference. The bankruptcy court agreed. This appeal ensued.

## JURISDICTION

The bankruptcy court had core proceeding jurisdiction per 28 U.S.C. §§ 157(b)(2)(F) and 1334(b). We have jurisdiction under 28 U.S.C. § 158(a)(1) because the summary judgment order was intended to be the court's last word on the adversary proceeding.

## ISSUE

Whether withdrawal of capital from a limited liability company, in a non-public, non-market transaction involving an illegally unregistered security, constitutes a "settlement payment" that is "commonly used in the securities trade," as defined by 11 U.S.C. § 741(8), and hence immune from avoidance as a preference in bankruptcy by 11 U.S.C. § 546(e).

## STANDARD OF REVIEW

■ We review summary judgment de novo. *Paine v. Griffin (In re Paine)*, 283 B.R. 33, 36 (9th Cir. BAP 2002).

## DISCUSSION

■ The parties agree that a membership interest in an LLC that is required to be the subject of a registration statement filed with the SEC is a "security" under

---

**3.** Circle Trust's summary judgment evidence included evidence of allegations that it demanded to withdraw from Six Sigma "after conducting due diligence" and that the demand was the beginning of the Ponzi scheme's end. Decl. of Margaret M. Mann in Supp. of Circle Trust's Mot. for Summ. J., Ex. 5, p. 48, ¶ 31.

the Bankruptcy Code. 11 U.S.C. § 101(49)(A) (2000).

Our basic task is to construe the meaning of the definition of "settlement payment," which was first enacted in 1982. The current version of the definition reads:

(8) "settlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade;

11 U.S.C. § 741(8) (2000).

■■■■ If the $4 million withdrawal from Six Sigma 89 days before bankruptcy was a "settlement payment,"[4] then § 546(e) insulates the transfer from avoidance as a preference.[5]

■■ Ascertaining the meaning of "settlement payment" is a "holistic endeavor" that requires us to consider the entire statutory scheme associated with its enactment and to reject plausible readings of isolated terms that are not compatible with the rest of the law. *Koons Buick Pontiac GMC, Inc. v. Nigh,* —— U.S. ——, ——– ——, 125 S.Ct. 460, 466–467, 160 L.Ed.2d 389 (2004) ("*Koons Buick*"); *McCarthy v. Bronson,* 500 U.S. 136, 139, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991) (statutory language must be read in proper context and not viewed in isolation); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

## I

The pertinent statutory scheme was created in 1982 by the stockbroker-commodity broker amendments to the Bankruptcy Code. Pub.L. 97–222, 96 Stat. 235 (1982).

## A

Public Law 97–222 was a package of amendments designed to protect the carefully-regulated mechanisms for clearing trades in securities and commodities in the public markets from dysfunction that could

---

**4.** Since this is defendant's summary judgment motion, we assume that all elements of a preference (including "antecedent debt") are present and that no defense alleged in the answer is established. Further, we assume, without deciding, that a Connecticut limited purpose trust company as a "financial institution" as defined by 11 U.S.C. § 101(22).

**5.** We reiterate the Ninth Circuit's *United Energy* footnote noting Ponzi schemes are more vulnerable to attack as fraudulent transfers than as preferences. *In re United Energy Corp.,* 944 F.2d at 594 n. 4. This appeal would be very different if the trustee had alleged that the withdrawals of capital (potentially, all $22 million, plus "interest" payments) were avoidable under 11 U.S.C. § 548(a)(1)(A) as "actually fraudulent" transfers. Since only the intent of the transferor matters in the avoidance analysis, proof that the transferor was running a Ponzi scheme can suffice to warrant a finding of actual fraud, which is not protected from avoidance by § 546(e). *E.g., Hayes v.* *Palm Seedlings Partners-A (In re Agric. Research & Tech. Group, Inc.),* 916 F.2d 528, 534–38 (9th Cir.1990); *Plotkin,* 199 B.R. at 716–17; *accord, Jobin v. McKay (In re M & L Bus. Mach. Co.),* 84 F.3d 1330, 1334–37 (10th Cir.1996), *aff'g* 164 B.R. 657 (D.Colo.1994), *aff'g* 155 B.R. 531 (Bankr.D.Colo.1993); *Merrill v. Abbott (In re Indep. Clearing House Co.),* 77 B.R. 843, 859–61 (D.Utah 1987) (en banc); Mark A. McDermott, *Ponzi Schemes & the Law of Fraudulent & Preferential Transfers,* 72 AM. BANKR. L.J. 157, 173–75 (1998); *cf. Wootton v. Barge (In re Cohen),* 875 F.2d 508, 511 (5th Cir.1989)(dictum). In the concomitant recovery analysis, even if a particular transfer is a "settlement payment" (and hence was for "value"), the transferee of an avoided fraudulent transfer may retain property transferred only if it also establishes that it received the transfer in "good faith," which question is a poor candidate for summary judgment. 11 U.S.C. §§ 548(c) & (d)(2)(B); *Jobin,* 84 F.3d at 1334–39; McDermott, 72 AM. BANKR. L.J. at 175–81.

result from the automatic stay and from certain trustee avoiding powers.

The protection for the securities industry had several interrelated facets aimed at permitting securities transactions to be liquidated under the eye of the SEC and the Securities Investor Protection Corporation ("SIPC") without being vulnerable to a bankruptcy attack that could destabilize markets.[6]

The key provision was the creation in 11 U.S.C. § 555 of a power for a stockbroker or securities clearing agency to exercise a contractual right to liquidate a securities contract—including a right set forth in a rule or bylaw of a national securities exchange, national securities association, or securities clearing agency—that could only be limited in a bankruptcy case if authorized under the Securities Investor Protection Act ("SIPA") or a statute administered by the SEC.[7]

A second facet of the protection was that the Act excepted from the automatic stay any setoff made by a stockbroker or securities clearing agency on account of claims against a debtor for a margin or settlement payment arising out of a securities contract against property held by or due from that stockbroker or securities clearing agency. Pub.L. 97–222, § 3(c).[8]

---

**6.** The House Committee report explained:

> The commodities and securities markets operate through a complex system of accounts and guarantees. Because of the structure of the clearing systems in these industries and the sometimes volatile nature [of] the markets, certain protections are necessary to prevent the insolvency of one commodity or security firm from spreading to other firms and possibly threatening the collapse of the affected market.
>
> . . .
>
> The amendments will ensure that the avoiding powers of a trustee are not construed to permit margin or settlement payments to be set aside except in cases of fraud and that, except as otherwise provided, the stay provisions of the Code are not construed to prevent brokers from closing out the open accounts of insolvent customers or brokers. The prompt closing out or liquidation of such open accounts freezes the status quo and minimizes the potentially massive losses and chain reactions that could occur if the market were to move sharply in the wrong direction.

H.Rep. No. 97–420, at 1–2, *reprinted at* 1982 U.S.C.C.A.N. 583–584.

**7.** The full provision as originally enacted was:

> § 555. Contractual right to liquidate a securities contract.
>
> The exercise of a contractual right of a stockbroker or securities clearing agency to cause the liquidation of a securities contract, as defined in section 741(7) of this

title, because of a condition of the kind specified in section 365(e)(1) of this title shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title unless such order is authorized under the provisions of the Securities Investor Protection Act of 1970 (15 U.S.C. 78aaa et seq.) or any statute administered by the Securities and Exchange Commission. As used in this section, the term "contractual right" includes a right set forth in a rule or bylaw of a national securities exchange, a national securities association, or a securities clearing agency.

11 U.S.C. § 555 (1982), *as enacted by* Pub.L. 97–222, § 6(a).

**8.** The revised exception to the automatic stay, insofar as applied to the securities industry, provided:

> (c) Section 362(b)(6) of title 11, United States Code, is amended to read as follows:
>
> "(6) under subsection (a) of this section, of the setoff by a [commodities industry entities omitted], stockbroker, or securities clearing agency of any mutual debt and claim under or in connection with [commodities industry contracts], or securities contracts, as defined in section 741(7) of this title, that constitutes the setoff of a claim against the debtor for a margin payment, as defined in section 741(5) or [commodities definition omitted] of this title, or settlement payment, as defined in section

Third, margin and settlement payments made to or by stockbrokers and securities clearing agencies were, with the exception of actually fraudulent transfers, insulated from trustee avoiding actions. Pub.L. 97–222, § 4.[9]

Finally, the terms "margin payment," "settlement payment," and "securities contract" were defined for purposes of the other provisions in this scheme in § 741.[10]

## B

In 1984, the provisions of Public Law 97–222 were amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984.

The examples named in the § 741(8) definition of "settlement payment" had the phrase "final settlement payment" added.[11]

The § 741(7) definition of "securities contract" was expanded to cover more products in the securities industry: options for the purchase or sale of a certificate of deposit or group or index of securities and options entered into on a national securities exchange relating to foreign currencies.[12]

The newly-defined term "financial institution" was added to § 546(e)'s list of entities insulated from avoiding powers with respect to settlement payments and to the list of entities authorized by § 555 to exercise a contractual right to liquidate a securities contract.[13] The definition appeared

---

741(8) of this title, arising out of [commodities industry contracts], or securities contracts against cash, securities, or other property held by such [commodities industry entities omitted], stockbroker, or securities clearing agency to margin, guarantee, or secure [commodities industry contracts omitted], or securities contracts;"
Pub.L. 97–222, § 3(c).

**9.** The original avoiding power provision, insofar as applied to the securities industry, provided:

Sec. 4. Section 546 of title 11, United States Code, is amended by adding at the end thereof the following new subsection: "(d) Notwithstanding sections 544, 545, 547, 548(a)(2), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 741(5) or 761(15) of this title, or settlement payment, as defined in § 741(8) of this title, made by or to a [commodities industry entities omitted], stockbroker, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1) of this title.".
Pub.L. 97–222, § 4.

**10.** The original definitions of "securities contract" and "settlement payment" provided:

(7) "securities contract" means contract for the purchase, sale, or loan of a security, including an option for the purchase or sale of a security, or the guarantee of any settle-

ment of cash or securities by or to a securities clearing agency;

(8) "settlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, or any other similar payment commonly used in the securities trade;
11 U.S.C. §§ 741(7)-(8), Pub.L. 97–222, § 8.

**11.** Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. 98–353, § 482, 98 Stat. 383.

**12.** The revised definition was:

(7) "securities contract" means contract for the purchase, sale, or loan of a security, including an option for the purchase or sale of a security, *certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any option entered into on a national securities exchange relating to foreign currencies,* or the guarantee of any settlement of cash or securities by or to a securities clearing agency;
28 U.S.C. § 741(7), as amended by Pub.L. 98–353, § 482, 98 Stat. 382–83 (new language emphasized).

**13.** *Id.*, §§ 461 & 469, 98 Stat. 377 & 380. A grammatical error in the amendment to § 546(e)—the omission of a comma after "stockbroker"—was corrected in 1986. Bankruptcy Judges, United States Trustees,

in new 11 U.S.C. § 101(19),[14] which later migrated to § 101(22) and was redefined in 2000.[15]

## II

Resolving the question whether transactions in illegally unregistered securities can be protected as § 741(8) settlement payments requires, under the Supreme Court's *Koons Buick* original statutory context precept, that we assess the relationship of Public Law 97–222 to the securities laws and the Bankruptcy Code.

Indeed, in a leading decision regarding Public Law 97–222, the Third Circuit held that it must construe the literal language of that statute in the context of the precise congressional intent. *Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Ass'n (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.)*, 878 F.2d 742, 751–53 (3d Cir.1989).[16]

When we do so, it is apparent that Public Law 97–222 was designed to enhance enforcement of the securities laws and rules assuring the integrity of securities markets.

## A

The bill that became Public Law 97–222, H.R. 4935, resulted from House Judiciary

and Family Farmer Bankruptcy Act of 1986, Pub.L. 99–554, § 283, 100 Stat. 3117.

**14.** The definition added in 1984 was:

> (19) "financial institution" means a person that is a commercial or savings bank, industrial savings bank, savings and loan association, or trust company and, when any such person is acting as agent or custodian for a customer in connection with a securities contract, as defined in section 741(7) of this title, such customer;

11 U.S.C. § 101(19) (1984 Supp.), Pub.L. 98–353, § 421, 98 Stat. 368 (1984), *redesignated as* § 101(21), Pub.L. 99–554, § 251, 100 Stat. 3104 (1986), *redesignated as* § 101(22), Pub.L. 101–647, § 2522, 104 Stat. 4867 (1990), *redefined*, Pub.L. 106–554, § 1(a)(5) & App. E § 409, 114 Stat. 2763 & 2763A–393–394 (2000).

**15.** Since 2000, the definition has been:

> (22) the term "financial institution"—
> (A) means—
> (i) a Federal reserve bank or an entity (domestic or foreign) that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, or receiver or conservator for such entity and, when any such Federal reserve bank, receiver, conservator, or entity is acting as agent or custodian for a customer in connection with a securities contract, as defined in section 741 of this title, the customer; or
> (ii) in connection with a securities contract, as defined in section 741 of this title,

an investment company registered under the Investment Company Act of 1940; and
> (B) includes any person described in subparagraph (A) which operates, or operates as, a multilateral clearing organization pursuant to section 409 of the Federal Deposit Insurance Corporation Improvement Act of 1991;

11 U.S.C. § 101(22) (2000), Pub.L. 106–554, § 1(a)(5) & App. E § 409, 114 Stat. 2763 & 2763A–393–394 (2000).

**16.** The Third Circuit explained:

> We believe that this is a classic instance where a court is required to ascertain the precise congressional intent represented by the words, as well as their literal meaning. This is because two important national legislative policies are on a collision course here, and it behooves the courts of the Third Article to decide which policy Congress intended must yield. On the one hand is the bankruptcy policy giving broad powers to a trustee to avoid transactions taking place within 90 days prior to the petition filing. This is reflected in sections 547 and 548 of the Code, giving the trustee power to avoid preferential or fraudulent transfers.
> On the other hand, the stated intent of the 97th Congress in the Bankruptcy Amendments of 1982 and the 98th Congress in the Bankruptcy Act of 1984 was to remove the right of the trustee to avoid transactions under certain instances.

*Bevill*, 878 F.2d at 751.

Committee oversight hearings at which there was testimony by, among others, the SEC, the Commodity Futures Trading Commission, SIPC, and National Securities Clearing Corporation regarding the need for protection of the organized markets against dysfunction in bankruptcy situations.[17]

1

The protection of settlement payments on securities trades responded to the concerns of the SEC and entities administering the market sales process that the bankruptcy of one firm in the clearance and settlement chain could produce a ripple effect that threatens other parties in the chain.

The Judiciary Committee's summary of its bill focuses on market trades that comply with the securities laws:

> The commodities and securities markets operate through a complex system of accounts and guarantees. Because of the structure of the clearing systems in these industries and the sometimes volatile nature [of] the markets, certain protections are necessary to prevent the insolvency of one commodity or security firm from spreading to other firms and possibly threatening the collapse of the affected market.
>
> The Bankruptcy Code now expressly provides certain protections to the commodities market to protect against such a "ripple effect." One of the market

protections presently contained in the Bankruptcy Code, for example, prevents a trustee in bankruptcy from avoiding or setting aside, as a preferential transfer, margin payments made to a commodity broker (see 11 U.S.C. Sec. 764(c)).

The thrust of several of the amendments contained in H.R. 4935 is to clarify and, in some instances, broaden the commodities market protections and expressly extend similar protections to the securities market. The amendments will ensure that the avoiding powers of a trustee are not construed to permit margin or settlement payments to be set aside except in cases of fraud and that, except as otherwise provided, the stay provisions of the Code are not construed to prevent brokers from closing out the open accounts of insolvent customers or brokers. The prompt closing out or liquidation of such open accounts freezes the status quo and minimizes the potentially massive losses and chain reactions that could occur if the market were to move sharply in the wrong direction.

> The bill provides that, ... [i]n the case of the securities industry, the contractual right of a broker or clearing agency to liquidate a securities contract may not be stayed, avoided, or otherwise limited in any bankruptcy proceeding unless an order affecting such right is authorized under the provisions of [SIPA] or any statute administered by the [SEC].

---

**17.** The House Report summarizes this history:

> On July 23 and September 17, 1981, the Subcommittee on Monopolies and Commercial Law held oversight hearings on the operation of the Bankruptcy Code with respect to the commodities and securities trading industries. The Subcommittee heard testimony from Philip McB. Johnson, Chairman of the Commodity Futures Trading Commission, Bevis Longstreth, Commissioner of the [SEC], Theodore H. Focht, General Counsel of [SIPC], and representa-

tives of numerous commodities and securities brokers and clearing organizations. H.R. 4935 was introduced on November 10, 1981 as a result of those hearings.

H.R. Rep. 97–420, at 2 (1982), U.S.Code Cong. & Admin.News 1982, pp. 583–84; *see, e.g., Bankr. of Commodity and Sec. Brokers: Hearings before Subcomm. on Monopolies & Commercial Law of Comm. on Judiciary of the H.R.*, 97th Cong. 294 (1981)(statement of Jack Nelson, Nat'l Sec. Clearing Corp.).

H.R. REP. No. 97–420, at 1–2 (1982), U.S.Code Cong. & Admin.News 1982, pp. 583–84.

It was, thus, axiomatic to the new § 555 contractual right to liquidate a securities contract that the relevant contractual rights had to be consistent with the securities laws. The main purpose was to protect legitimate securities markets from market fluctuations that, without specific protection from basic bankruptcy rules, created "an inordinate risk that the insolvency of one party could trigger a chain reaction of insolvencies of the others who carry accounts for that party and undermine the integrity of those markets."[18]

Further, the protection was crafted to assure compliance with securities laws. Thus, § 555 stipulates that the right to liquidate a securities contract does not trump orders affecting trades that are issued under either SIPA or "any statute administered by the" SEC.

The House Report also clarified that the parallel exception to the automatic stay permitting setoff of margin or settlement payments, 11 U.S.C. § 362(b)(6), did "not permit a setoff which would be unlawful under any applicable law or regulation."[19]

Similarly, the limitation on avoiding powers in what is now § 546(e) does not extend to actually fraudulent transfers that were not received in good faith.[20]

---

18. The House Report explained:

Section 6(a) adds a new section 555 to title 11 to provide that the exercise of a contractual right of a stockbroker or securities clearing agency to cause the liquidation of a securities contract, because of a condition of the kind specified in section 365(e)(1) of title 11, shall not be stayed, avoided, or otherwise limited in any proceeding under title 11 by a court or administrative agency, unless such order is authorized under the provisions of [SIPA] or any statute administered by the [SEC]. The prompt liquidation of an insolvent's position is generally desirable to minimize the potentially massive losses and chain reaction of insolvencies that could occur if the market were to move sharply in the wrong direction.

H.R. REP. No. 97–420, at 3–4, U.S.Code Cong. & Admin.News 1982, pp. 583, 584–85.

The floor statement in the Senate was to the same effect:

It is essential that stockbrokers and securities clearing agencies be protected from the issuance of a court or administrative agency order which would stay the prompt liquidation of an insolvent's position, because market fluctuations in the securities markets create an inordinate risk that the insolvency of one party could trigger a chain reaction of insolvencies of the others who carry accounts for that party and undermine the integrity of those markets.

128 Cong. Rec. 15, 981 (July 13, 1982) (Remarks of Sen. Dole).

19. The House Report explains the revised § 362(b)(6):

Section 3(c) is intended to clarify that, despite the automatic stay of section 362(a), a [commodities industry entities omitted], stockbroker, or securities clearing agency may set off a claim for a margin or settlement payment arising out of commodities contracts, forward contracts, or securities contract[s] against cash, securities or other property which it is holding to margin, guarantee, or secure such contracts, notwithstanding the bankruptcy of the party for whose account such cash, securities, or property is held. *This section does not permit a setoff which would be unlawful under any applicable law or regulation.*

H.R. REP. No. 97–420, at 3, U.S.Code Cong. & Admin.News 1982, pp. 583, 584–85 (emphasis supplied).

20. The House Report explains:

Section 4 creates a new Section 546(d)[now (e)]. This amendment is made simultaneously with the repeal of section 764(c) of title 11. Section 546(d)[ (e) ], together with provisions of section 548, prohibits a trustee from avoiding a transfer that is a margin payment to a commodity broker or forward contract merchant or is a settlement payment made by a clearing organization, except where the transfer was made with intent to hinder, delay, or defraud other creditors and was not taken in good faith.

This connotes a statutory scheme designed to protect trades that comply with the securities laws, but not to protect the laundering of actual fraud.

It is in this context that the term "settlement payment" was defined in Public Law 97–222 and should be construed.

### 2

The difficulty with the definition of "settlement payment" is that it relies on a conclusory laundry list of securities industry terms of art that contain the words "settlement payment" without articulating the elements of a settlement payment. The definition, however, is rescued from the apparent circularity by the clause "or any other similar payment *commonly used in the securities trade.*" 11 U.S.C. § 741(8) (emphasis supplied).

■ Determining common usage in the securities trade requires attention to the operation of trades in the securities industry. Whatever else a settlement payment may be, it is restricted to the securities trade and must be "commonly used."

■ This requirement of common usage in the securities trade necessarily excludes non-public trades in illegally unregistered securities. If integrity and compliance with securities laws are to be preserved as the hallmark of the brand name of the United States securities markets, then trades in illegally unregistered securities must flunk the common usage test. An essential purpose of the federal securities laws is to ban trafficking in illegally unregistered securities so as to promote the reputation of American securities markets as safe for investment.

In short, the statutory protection of settlement payments presupposes that securities laws are not being offended. In other words, Public Law 97–222 operated to coordinate and harmonize the securities laws and the Bankruptcy Code.

### B

The next step in the "holistic endeavor" is to consider whether the 1984 amendments that added "financial institutions" to the list of entities protected by Public Law 97–222 changed the statutory context of furthering the securities laws.

The 1984 legislative history is scant. The additions of "financial institution" appeared in Subtitle H ("Miscellaneous Amendments to Title 11") of the Bankruptcy Amendments and Federal Judgeship Act of 1984 amidst technical corrections that did such things as substitute "stockbroker" for "stock broker" in a definition and substitute "stockbroker" for "stockholder" in the section designating the applicability of the stockbroker liquidation provisions of chapter 7.[21] The absence of an explanation why a "financial institution" needed to become a protected entity implies that the change was regarded as neither significant, nor controversial.

Had Congress simultaneously meant to create a safe harbor from compliance with the securities laws and abandon common usage in the securities trade as the touchstone for construing protected settlement payments, Congress likely would have

---

The new section 546(d) [(e)] reiterates the provisions of current section 764(c). The new section also encompasses both stockbrokers and securities clearing agencies.
H.R. Rep. No. 97–420, at 3, U.S.Code Cong. & Admin.News 1982, pp. 583, 584–85.

21. *E.g.,* Pub.L. 98–353, § 421(e), 98 Stat. 368 ("Section 101(24) of title 11 of the United States Code is amended by striking out 'stock broker' and inserting in lieu thereof 'stockbroker'."), & § 423, 98 Stat. 369 ("Section 103(c) of the United States Code is amended by striking out 'stockholder' and inserting in lieu thereof 'stockbroker'.")

flagged so substantial a departure from the underlying premise of Public Law 97–222 that the securities laws were being harmonized, not preempted. *See Koons Buick,* —— U.S. at ——, 125 S.Ct. at 468.

■ It follows that the term "settlement payment" implies trades that comply with the securities laws.

### III

The judicial decisions construing settlement payments comport with the view that the protection is directed to transactions involving legitimate securities markets.

Although the rhetoric of decisions describes the § 741(8) definition of "settlement payment" as being "broad" or "extremely broad," reality is different. The decisions that actually have found protected settlement payments to exist have involved publicly traded securities in public markets in which an intermediary played a role. *Wyle v. Howard, Weil, Labouisse, Freidrichs Inc. (In re Hamilton Taft & Co.),* 114 F.3d 991, 993 (9th Cir.1997); *Jonas v. Resolution Trust Corp. (In re Comark),* 971 F.2d 322, 325–26 (9th Cir.1992); *Jonas v. Farmer Bros. Co. (In re Comark),* 145 B.R. 47, 52 (9th Cir. BAP 1992); *accord, Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.),* 181 F.3d 505, 515–16 (3d Cir.1999); *Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.),* 952 F.2d 1230, 1237–41 (10th Cir.1991); *Kaiser Steel Corp. v. Charles Schwab & Co. (In re Kaiser Steel Corp.),* 913 F.2d 846, 848–50 (10th Cir. 1990); *Bevill,* 878 F.2d at 751–53.

Despite the breadth of the meaning of the term settlement payment, courts recognize that it nevertheless has limits. *KSC Recovery, Inc. v. First Boston Corp. (In re Kaiser Merger Litig.),* 168 B.R. 991, 1001 (D.Colo.1994) (while "definition of 'settlement payment' is broad, it is not boundless"); *Weinman v. Fid. Capital Ap-preciation Fund (In re Integra Realty Res., Inc.),* 198 B.R. 352, 359–60 (Bankr. D.Colo.1996) (same).

In determining those limits, courts consistently focus on the context of the statute as having been designed to protect public markets. *E.g., Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.),* 263 B.R. 406, 478–80 (S.D.N.Y.2001) ("*Adler, Coleman Clearing*"); *Jewel Recovery, L.P. v. Gordon,* 196 B.R. 348, 352–53 (N.D.Tex. 1996); *Wieboldt Stores, Inc. v. Schottenstein,* 131 B.R. 655, 663–65 (N.D.Ill.1991) (no effect on clearance or settlement process).

The boundary that emerges from such decisions approximates the line between public transactions that involve the clearance and settlement process and non-public transactions that do not involve that process.

Thus, common elements in decisions finding that there is not a protected settlement payment are that the securities involved are not publicly traded and public markets are not utilized. In most of these situations, there is no intermediary. *Zahn v. Yucaipa Capital Fund,* 218 B.R. 656, 675–77 (D.R.I.1998); *Jewel Recovery, L.P.,* 196 B.R. 348, 351–53 (N.D.Tex.1996); *KSC Recovery, Inc.,* 168 B.R. at 1000–01; *Official Comm. v. Asea Brown Boveri, Inc. (In re Grand Eagle Cos.),* 288 B.R. 484, 491–95 (Bankr.N.D.Ohio 2003); *Weinman,* 198 B.R. at 359–60.

The few decisions that involve outright illegality or transparent manipulation reject § 546(e) protection. In dealing with a preference action based on a Ponzi scheme that had been operated as a sham stock brokerage by an unlicensed ex-felon, the Fifth Circuit did not reach the settlement payment question because the debtor flunked the statutory test of being a "stockbroker" and, thus, could not have

made a transfer protected by § 546(e). 11 U.S.C. § 101(46) (now § 101(53A)); *Wider v. Wootton,* 907 F.2d 570, 572–73 (5th Cir. 1990).

The definition of settlement payment was central to the district court's appellate decision in *Adler, Coleman Clearing,* which involved "criminal conduct" by a stockbroker in manipulating prices of stocks through phony trades. Hanover, Sterling & Co. ("Hanover"), a stockbroker and market maker, knowing that regulators would shut it down for violating net capital rules, illegally hid its predicament long enough to enable its brokers to execute fake purchases and fake short sales for selected clients. Hanover posted "payments" to the accounts of the favored customers based on the fake trades. The purpose of the phantom transactions was to increase the insured SIPA claims of favored Hanover clients, who were insiders and/or persons who might keep their business with individual Hanover brokers in later employment. *Adler, Coleman Clearing,* 263 B.R. at 417–23, *adopting facts from Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.),* 247 B.R. 51, 65–72 (Bankr.S.D.N.Y.1999). The phony trades generated fatal liability for Adler, Coleman Clearing, which serviced and guaranteed Hanover trades. The Adler, Coleman trustee challenged the phony payments.

The district court, after reviewing the history and context of the statute and surveying the decisional law, focused on the normative aspect of the § 741(8) definition of settlement payment: "commonly used in the securities trade." This, it reasoned, established a reference point based on "transfers in the ordinary course of business 'normally regarded [in the securities trade] as part of the settlement process' for the particular transaction." *Adler, Coleman Clearing,* 263 B.R. at 481 (paren-thetical in original), *citing Bevill,* 878 F.2d at 752. It concluded that the phantom payments were so steeped in fraud that they "can hardly be deemed so 'normally regarded.' " *Id.* Finally, it noted the irony that Hanover's fraud was specifically designed to undermine the statutory scheme enacted in Public Law 97–222 to protect the securities industry. *Id.*

The essence of the *Adler, Coleman Clearing* analysis is that the disputed payments were not "commonly used in the securities trade" within the meaning of § 741(8), which we find persuasive.

IV

Having assessed the context of the statute and the patterns of judicial interpretations of "settlement payment," we return to the appeal at hand.

The transaction in question did not occur on a public market and did not involve the process of clearing trades. This places it within the pattern of cases that have concluded that a statutorily-protected "settlement payment" is not present.

Moreover, under the summary judgment rules that require us to construe the facts in the light most favorable to the non-moving plaintiff, we are obliged to presume that the payments on Circle Trust's demands to withdraw capital were made in an effort to prolong a Ponzi scheme that would have collapsed immediately if Six Sigma had paid the full amount of Circle Trust's demand at the time it was due under the Six Sigma operating agreement, sixty days after Circle Trust's September 28, 2001, notice.

Thus, the facts correspond with the *Adler, Coleman Clearing* situation that was so steeped in fraud that the particular transactions could not be "normally regarded" as part of the settlement process.

*Adler, Coleman Clearing,* 263 B.R. at 481, citing *Bevill,* 878 F.2d at 752.

If we focus on the plain language of § 741(8), it is apparent that the Six Sigma transfer of $4 million to Circle Trust as a withdrawal of capital was not designated by the participating parties by any term that included the words "settlement payment." Hence, it was not one of the specific payments catalogued in § 741(8): it was neither a "preliminary settlement payment," nor a "partial settlement payment," nor an "interim settlement payment", nor a "settlement payment on account," nor a "final settlement payment." 11 U.S.C. § 741(8).

Since the $4 million transfer was not designated by any term that included the words "settlement payment," the transfer would constitute a "settlement payment" under the language of § 741(8), only if it qualified as a "similar payment commonly used in the securities trade." *Id.*[22]

The fact that the transfer was a transaction in an illegally unregistered security can hardly be described as a "payment *commonly* used in the securities trade." *Id.* (emphasis supplied). To the contrary, the viability of the securities markets depends on the ability to enforce provisions outlawing trades in illegally unregistered securities. To construe a transaction in an illegally unregistered security as "commonly" occurring in the securities trade would amount to an absurd contradiction of the securities laws.

As noted, the decisions of the Third Circuit in *Bevill* and the district court in *Adler, Coleman Clearing* confirm that the meaning of "settlement payment" must be construed in light of "transfers which are normally regarded as part of the settlement process." *Bevill,* 878 F.2d at 752; *Adler, Coleman Clearing,* 263 B.R. at 481. Since protecting trades in illegally unregistered securities cannot be described as "normally regarded" as entitled to any legitimacy in the securities trade, honoring such a trade would undermine the statutory scheme harmonizing the Bankruptcy Code and the securities laws.

It follows that the withdrawal of capital does not qualify as a "settlement payment" under § 741(8) because a non-public trade in an illegally unregistered security is not "commonly used in the securities trade."

\* \* \* \* \* \*

The court incorrectly held that the $4 million received by Circle Trust from Six Sigma 89 days before bankruptcy was a settlement payment within the meaning of § 741(8) and hence insulated from recovery by § 546(e).

REVERSED and REMANDED.

---

**22.** We assume, without deciding, that Circle Trust's withdrawal of capital from Six. Sigma can be construed as a "securities contract" under § 741(7). It is, however, not certain that withdrawal of net capital from a limited liability company requires settlement in the sense of a transaction in the securities industry. When the Ninth Circuit ruled that withdrawal from a Reverse Repo agreement was a Repo "transaction," it reasoned that return of the securities being held by the withdrawing party was necessary to return the parties "to a kind of status quo ante" and that, accordingly, a protected settlement payment ensued because "[n]either party reasonably could consider Comark's withdrawal 'settled' until GreatAmerican received the over $9 million dollars worth of securities Comark had in its possession." *Comark,* 971 F.2d at 326. It is an open question whether this analysis would extend to Circle Trust's withdrawal demand, which contractually entitled it to no more than its "net capital account" that was supposed to reflect the net of Six Sigma's losses and profits—possibly zero. If the capital account had been accurately calculated, then Circle Trust may have been entitled to less than the $22 million it received.