325 B.R. 671 (2005)
In re ENRON CORP., et al., Reorganized Debtors.
Enron Corp., Plaintiff,
v.
J.P. Morgan Securities, Inc., et al., Defendants.
Enron Corp., Plaintiff,
v.
Mass Mutual Life Insurance Co., et al., Defendants.
Bankruptcy No. 01 B 16034(AJG), Adversary No. 03-92677 A, Adversary No. 03-92682 A.
United States Bankruptcy Court, S.D. New York.
June 15, 2005.
*672 *673 *674 Venable LLP, by Richard L. Wasserman, Esq., Michael Schatzow, Esq., Robert L. Wilkins, Esq., Baltimore, MD, Special Litigation Counsel for Enron Corp.
Togut, Segal & Segal, LLP, by Albert Togut, Esq., Howard P. Magaliff, Esq., Frank A. Oswald, Esq., Scott E. Ratner, Esq., of Counsel, New York, NY, Co-Counsel for the Debtors.
Squire, Sanders & Dempsey LLP, by Jeffrey A. Marks, Esq., Cincinnati, OH, Counsel for the Official Committee of Unsecured Creditors.
Bingham McCutchen LLP, by Tina L. Brozman, Esq., Mark M. Elliot, Esq., Joshua Dorchak, Esq., New York, NY, Counsel for Allstate Life Insurance Company, Deutsche Bank Securities, Menlo Life Insurance Co., Charles Schwab Investment Management, Inc., Schwab YieldPlus Fund and two Diversified Funds.
Bingham McCutchen LLP, by Sabin Willett, Esq., Boston, MA, Counsel for Allstate Life Insurance Company, and two Diversified Funds.
Bingham McCutchen LLP, by Harold S. Horwich, Esq., Hartford, CT, Counsel for Menlo Life Insurance.
Cleary, Gottlieb, Steen & Hamilton, by Jeffrey A. Rosenthal, Esq., Boaz A. Weinstein, Esq., New York, NY, for Lehman Commercial Paper, Inc., and Lehman Brothers International Europe.
Cleary, Gottlieb, Steen & Hamilton, by Lindsee P. Granfield, Esq., Max Gitter, Esq., New York, NY, Counsel for Goldman, Sachs & Co.
Fulbright & Jaworski LLP, by David A. Rosenzweig, Esq., New York, NY, Zack A. Clement, Esq., Linda L. Addison, Esq., R. Andrew Black, Esq., David A. Rosenzweig, Esq., Houston, TX, Counsel for The Northern Trust Company.
Kirkpatrick & Lockhart LLC, by Keith W. Miller, Esq., Jeffrey N. Rich, Esq., Robert N. Michaelson, Esq., New York, NY, Counsel for M & T Investment Advisors, Inc. f/k/a Allied Investment Advisors Inc.
Choate Hall & Stewart, by Michael A. Walsh, Esq., Charles L. Glerum, Esq., Boston, MA, Counsel for Mass Mutual Life Insurance Company and Affiliates.
Clifford Chance U.S. LLP, by Wendy A. Kraus, Esq., Madlyn Primoff, Esq., New York, NY, Counsel for Banco Provincial Overseas, N.V.
Pillsbury Winthrop LLP, by Karen Dine, Esq., New York, NY, Counsel for The Bank of New York Company, Inc.
Holland & Knight, LLP, by Arthur E. Rosenberg, Esq., Barbara R. Parlin, Esq., New York, NY, Attorneys for Thrivent Financial Defendants and Analog Devices, Inc.
*675 Holland & Knight, LLP, by John J. Monaghan, Esq., Boston, MA, Counsel for Analog Devices, Inc.
Hughes Hubbard & Reed LLP, by James W. Giddens, Esq., Christopher K. Kiplok, Esq., New York, NY, Counsel for the Aetna Defendants.
Wormser, Kiely, Galef & Jacobs LLP, by Janice B. Grubin, Esq., New York, NY, Counsel for the Belo Company.
Patterson, Belknap, Webb & Tyler LLP, by David W. Dykhouse, Esq., Anne E. Reilly, Esq., New York, NY, Counsel for the Inverban Defendants.
Kramer Levin Naftalis & Frankel LLP, by Gary M. Becker, Esq., New York, NY, Counsel for Piper Jaffray & Co., AXA Defendants, and Fleet Defendants.
Lovells, by Karen Ostad, Esq., Dina Gielchinsky, Esq., New York, NY, Counsel for Marlon Insurance Company Limited and Capital Assurance Company, Inc.
Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., by William W. Kannel, Esq., Kevin J. Walsh, Esq., Boston, MA, Counsel for State Street Bank & Trust Company.
Gregory P. Joseph Law Offices LLC, by Gregory P. Joseph, Esq., Mara Leventhal, Esq., New York, NY, Scarcella Rosen & Slome LLP, by Louis A. Scarcella, Esq., Uniondale, NY, Attorneys for Banco Espirito and Scott and White Defendants.
Wilmer Cutler Pickering LLP, by Philip D. Anker, Esq., Matthew P. Previn, Esq., New York, NY, Counsel for Bank One Trust Company, N.A.
Hunton & Williams LLP, by Tyler P. Brown, Esq., Benjamin C. Ackerly, Esq., Michael C. Shepherd, Esq., Richmond, VA, Counsel for General Motors Defendants and Trusco Capital Management, Inc.
Hunton & Williams LLP, by Joseph J. Saltarelli, Esq., New York, NY, Counsel for Trusco Capital Management, Inc.
Cravath, Swaine & Moore, Esq., by Andrew B. Kratenstein, Esq., New York, NY, Counsel for Credit Suisse First Boston LLC.
Stites & Harbison PLLC, by W. Robinson Beard, Esq., Charles J. Cronan, IV, Esq., Louisville, KY, Counsel for Brown-Forman Corp. and Longnorth Ltd.
Seyfarth Shaw LLP, by Gus A. Paloian, Esq., William J. Factor, Esq., Charles S. Riecke, Esq., Chicago, IL, Counsel for Northern Trust Banking Customers.
Seyfarth Shaw LLP, by Andrew T. Hahn, Sr., Esq., New York, NY, Counsel for Northern Trust Customers.
Dreier LLP, by Noramn N. Kinel, Esq., Timothy A. Solomon, Esq., New York, NY, Counsel for Nomura Asset Management U.S.A. Inc., the Bond Select Trust, Global Fund Management S.A., and Nomura Bank (Luxembourg) S.A.
Dewey Ballantine LLP, by Benjamin Hoch, Esq., James P. Smith III, Esq., Carey D. Schreiber, Esq., James P. Smith, III, Esq., New York, NY, Counsel for MONY Defendants.
Morris, Nichols, Arsht & Tunnell, by Derek C. Abbott, Esq., Robert J. Dehney, Esq., Wilmington, DE, Counsel for Wilmington Trust Company, GMP Companies, Inc., EchoStar Communications Corp.
Westermann Hamilton Sheehy Aydelott & Keenan LLP, by Tara B. Mulrooney, Esq., Garden City, NY, Counsel for Defendant Diversified Investment Advisors.
Kelley Drye & Warren LLP, by Steven P. Caley, Esq., Mark I. Bane, Esq., New York, NY, Counsel for the J.P. Morgan Defendants.
Otterbourg, Steindler, Houston & Rosen, P.C., by Peter Feldman, Esq., William *676 M. Silverman, Esq., John Bougiamas, Esq., Anthony M. Piccone, Esq., New York, NY, Counsel for The Mitsubishi Trust & Banking Corp., individually and as Trustee of the Merrill Lynch Tanchucki Bond Open Mother Fund, and the Aeltus Defendants.
Paul, Weiss, Rifkind, Wharton & Garrison LLP, by Douglas R. Davis, Esq., Stephen J. Shimshak, Esq., New York, NY, Counsel for Citibank NA and its Affiliates, Banco National de Mexico.
Curtis Mallet-Provost Colt & Mosley, by Miriam Harwood, Esq., New York, NY, Counsel for Defendant Banco Serfin, S.A.
Sidley Austin Brown & Wood LLP, by William M. Goldman, Esq., John G. Hutchinson, Esq., New York, NY, Counsel for Merrill Lynch Investment Managers, L.P.
White & Case LLP, by Evan C. Hollander, Esq., Sheron Korpus, Esq., New York, NY, Counsel for the UBS Defendants, Saltash Enterprises, and Harald and Joann McPike.
Debevoise & Plimpton, by Michael E. Wiles, Esq., New York, NY, Counsel for the Prudential Defendants.
Schulte Roth & Zabel LLP, by Michael L. Cook, Esq., Alix S. Pustilnik, Esq., New York, NY, Counsel for Alfa, S.A. de C.V.
Buchanan Ingersoll, by Margaret Manning, Esq., Wilmington, DE, Susan P. Persichilli, Esq., New York, NY, Counsel for New Castle County.
Pepper Hamilton LLP, by Linda J. Casey, Esq., Thomas E. Zemaitis, Esq., Philadelphia, PA, I. William Cohen, David Murphy, Julie M. Skidmore, Detroit, MI, for Kelly Properties, Inc.
Peitzman, Weg & Kempinsky, LLP, by Howard J. Weg, Esq., Louis E. Kempinsky, Esq., James P. Menton, Jr., Esq., Los Angeles, CA, Hahn & Hessen LLP, by Roseanne Thomas Matzat, Esq., New York, NY, Counsel for Cascade Investment, L.L.C.
Pachulski Stang Ziehn & Weintraub, by Stanley Goldich, Esq., Los Angeles, CA, Counsel for Fremont General.
Klehr Harrison, Harvey & Branzburg & Ellers LLP, by Carolyn Hochstadter Dicker, Esq., Morton R. Branzburg, Esq., Philadelphia, PA, Counsel for Fiserv Securities, Inc.
Bialson Bergen & Schwab, by Lawrence M. Schwab, Esq., Kenneth T. Law, Esq., Patrick M. Costello, Esq., Palo Alto, CA, Martin P. Ochs, by Martin P. Ochs, Esq., New York, NY, Counsel for Veritas Software Investment Corp.
Farrell Fritz, P.C., by Ted A. Berkowitz, Esq., David Scheffel, Esq., Uniondale, NY, Counsel for Lewis and Clark College.
Vorys, Sater, Seymour And Pease LLP, by Robert J. Sidman, Esq., Columbus, OH, Counsel for the Abercrombie & Fitch Defendants.
Blank Rome LLP, by Andrew B. Eckstein, Esq., New York, NY, Co-Counsel for the Abercrombie & Fitch Defendants.
Anderson Kill & Olick, P.C., by Michael J. Venditto, Esq., Paul A. Rachmuth, Esq., New York, NY, Hughes & Luce LLP, by Sabrina L. Streusand, Esq., G. James Landon, Esq., Austin, TX, Co-Counsel for the Dell Products Defendants.
Riddell Williams P.S., by Robert Amkraut, Esq., Seattle, WA, Counsel for Electroimpact, Inc.
Balber Pickard Battistoni Maldonado & Van Der Tuin PC, by Thomas P. Battistoni, Esq., Mary Jane Wagg, Esq., New York, NY, Co-Counsel for Electroimpact, Inc.
Drinker Biddle & Reath LLP, by Andrew C. Kassner, Esq., David B. Aaronson, Esq., Philadelphia, PA, Counsel for AIM.
*677 Robinson & Cole LLP, by Joseph L. Clasen, Esq., Christopher J. Major, Esq., New York, NY, Holland & Hart LLP, by Donald D. Allen, Esq., Larry E. Prince, Esq., Denver, CO, Counsel for Winco Foods, Inc.
Chadbourne & Parke LLP, by Howard Seife, Esq., Thomas J. Hall, Esq., Andre Rosenblatt, Esq., New York, NY, Counsel for Brahms Funding Corp. and Dresdner Bank AG.
Allen & Overy, by Daniel P. Cunningham, Esq., Hugh McDonald, Esq., Joshua D. Cohn, Esq., New York, NY, Counsel for The Bond Market Association.

MEMORANDUM OPINION DENYING DEFENDANTS' MOTIONS TO DISMISS COMPLAINTS
ARTHUR J. GONZALEZ, Bankruptcy Judge.
The issue presented is whether payments made by various entities in connection with certain transactions involving short-term commercial paper are "settlement payments" within the context of 11 U.S.C. § 546(e) which would, as a matter of law, preclude the relief sought by the plaintiff in the adversary proceedings and warrant dismissal of such proceedings pursuant to Federal Rule of Bankruptcy Procedure 7012 and Fed. Rule of Civil Procedure 12(b)(6).
The Court concludes that in order for a payment to qualify as a settlement payment protected by § 546(e) from a trustee's avoidance powers, such payment must be common within the securities trade. Thus, whether payments that are made with respect to short-term commercial paper prior to the maturity date, at significantly above market prices and contrary to the offering documents, qualify as settlement payments is a factual issue requiring a trial. Therefore, dismissal of the adversary proceedings at this stage is improper.

FACTS
Commencing on December 2, 2001, and from time to time continuing thereafter, Enron Corporation ("Enron") and certain of its affiliated entities, (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On July 15, 2004, the Court entered an Order confirming the Debtors' Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors (the "Plan") in these cases. The Plan became effective on November 17, 2004.
On 2003, Enron filed a complaint commencing an adversary proceeding against J.P. Morgan Securities, Inc. ("J.P.Morgan") and various other defendants (together with J.P. Morgan, the "J.P. Morgan Defendants") and filed a separate complaint commencing an adversary proceeding against Mass Mutual Life Insurance Company ("Mass Mutual") and various other defendants (together with Mass Mutual, the "Mass Mutual Defendants"). In each adversary proceeding, Enron sought to avoid and recover certain transfers to the defendants that it alleged were preferential or otherwise avoidable. On December 1, 2003, Enron filed amended complaints with respect to each of the adversary proceedings (each individually, as amended, the "Complaint" and together, the "Complaints").[1]
*678 *679 In the Complaint filed against the J.P. Morgan Defendants, Enron seeks to recover transfers made by Enron between October 26, and November 6, 2001 to the J.P. Morgan Defendants totaling $892,275,859.66. In the Complaint filed against the Mass Mutual Defendants, Enron seeks to recover transfers made by Enron between October 26 and November 6, 2001 to the Mass Mutual Defendants totaling $233,677,604.88 (the transfers made to the J.P. Morgan Defendants and the transfers made to the Mass Mutual Defendants are collectively referred to as the "Transfers").
Prior to the petition date, Enron issued and sold unsecured commercial paper to various entities. The commercial paper was uncertificated and had maturities of up to 270 days. Pursuant to Issuing and Paying Agency Agreements between Enron and JP Morgan Chase Bank and its predecessors in interest (collectively, the "Chase Paying Agent"), the Chase Paying Agent served as issuing and paying agent in connection with Enron's commercial paper.
The purchase and sale of Enron's commercial paper, including each commercial paper note identified in the amended complaints *680 ( the "Notes"), were made pursuant to terms set forth in an Offering Memorandum, dated September 14, 2001. The Offering Memorandum provided as follows: "The Notes are not redeemable or subject to voluntary prepayment by [Enron] prior to maturity." Moreover, the terms of the Enron commercial paper notes did not have a provision allowing prepayment or early redemption of the commercial paper notes.
Each of J.P. Morgan, Goldman, Sachs & Co. ("Goldman") and Lehman Commercial Paper Inc. ("Lehman") acquired the Enron commercial paper for its own account, as a market maker, and on behalf of its respective customers, as a dealer. Those customers purchasing the Notes through one of these dealers bought them either from Enron itself or from other holders of outstanding Enron commercial paper who sold certain of their holdings before maturity. J.P. Morgan, Goldman and Lehman documented their and their customer's purchases of Enron commercial paper through trading confirmation records (the "Confirmations"). The payment for the purchases were made through Depository Trust Company ("DTC"), a clearing agency.
As previously noted, in a series of transactions commencing on October 26 and concluding on November 6, 2001, Enron transferred over one billion dollars in connection with the Notes  $892,275,859.66 to the J.P. Morgan Defendants and $233,677,604.88 to the Mass Mutual Defendants. In the Complaints, Enron maintains that the Transfers were for the purpose of prepaying the Notes that had been sold to J.P. Morgan, Goldman, Lehman and other entities when issued. Enron maintains that the Transfers were made by Enron to prepay individual Notes prior to the maturity date of those Notes. As Enron paid approximate accrued par value[2] for the Notes, which was significantly more than their market value, Enron characterizes the Transfers as being made for the early redemption of the Notes. Enron further maintains that such Transfers were in violations of the terms of sale of those Notes because the terms expressly prohibited any early redemption or prepayment of the Notes. In the Complaints, Enron delineates the individual transfers that it seeks to avoid against the various defendants in each of the actions.
In the Complaints, Enron alleges that, prior to making the Transfers, some or all of the other defendants in each of the adversary proceedings were aware that the Transfers might be subject to avoidance as J.P. Morgan, Goldman and/or Lehman had informed them that these Transfers could be subject to avoidance as preferential transfers.
In Count I of the each Complaint, Enron seeks avoidance of the Transfers as preferential payments under section 547(b) of the Bankruptcy Code. In Count III of each Complaint, Enron seeks avoidance of the Transfers as fraudulent conveyances under section 548(a) of the Bankruptcy Code. In Count V of each Complaint, Enron seeks avoidance of the Transfers as fraudulent, pursuant to section 544(b) of the Bankruptcy Code and any applicable state fraudulent conveyance or transfer law. In Counts II, IV and VI of each Complaint, Enron seeks recovery, pursuant to section 550 of the Bankruptcy Code, of any of the Transfers that are deemed avoided, under Counts I, III and V of the respective Complaints, as preferential transfers or fraudulent *681 conveyances or transfers. In Count VII of each Complaint, Enron seeks disallowance of any claims of each defendant against Enron unless and until such defendant turns over, or pays the value, to Enron of any transferred property for which the defendant is determined to be liable to Enron pursuant to section 550 of the Bankruptcy Code.
On February 18 and 19, 2004, substantially all of the defendants in each of the adversary proceedings filed motions to dismiss their respective Amended Complaints.[3] or joined in those motions to dismiss filed by others (the defendants who filed and/or joined in motions to dismiss are referred to collectively as, the "Defendants"). In the motions to dismiss, the Defendants argue that the counts of the Complaints seeking to avoid the Transfers as preferential payments, pursuant to section 547(b) of the Bankruptcy Code, and as fraudulent conveyances, pursuant to sections 544(b) and 548(a) of the Bankruptcy Code should be dismissed because the Transfers were "settlement payments" made to complete securities transactions and, as a matter of law, are protected from avoidance by sections 546(e) and 548(d)(2)(B) of the Bankruptcy Code  the "safe harbor" provisions. The Defendants contend that the Transfers were payments by Enron for purchases of its outstanding commercial paper qualifying them as "settlement payments" to complete securities transactions. Further, the Defendants assert that because the Transfers were made by or to a stockbroker, financial institution or through a securities clearing agency, they are settlement payments protected by the "safe harbor" provisions of the Bankruptcy Code.
In addition, the Defendants argue that as a consequence of the Transfers not being subject to avoidance, the Counts of the Complaints which seek recovery of any avoided transfers, pursuant to section 550 of the Bankruptcy Code, or disallowance, pursuant to section 502(d) of the Bankruptcy Code, of other claims by the Defendants until the avoided Transfers are recovered also must be rejected. Certain of the Defendants also move to dismiss the counts of the Complaints seeking to disallow their other claims based on the fact that they have not filed any proofs of claim against the Debtors.
Enron opposes the Motions to Dismiss. Enron argues that, as a matter of law, the safe harbor provided for securities transactions by the Bankruptcy Code does not apply to the Transfers. First, Enron contends that the Transfers are not within the ambit of the protection afforded by the safe harbor provisions of the Bankruptcy Code because the Transfers were not purchases of securities. Rather, Enron maintains that the Transfers were payments for the early redemption of the Notes. Further, Enron contends that as prepayments for the Notes, the transactions were contrary to the terms of the pertinent offering documents. Enron maintains that it prepaid and redeemed the commercial paper by making full payment prior to its maturity. Therefore, Enron argues that the Transfers, made for early redemption of commercial paper at significantly above market price and contrary to the terms of the offering documents which prohibited such prepayments, were not "settlement payments" commonly used in the securities trade as required by section 546(e) of the Bankruptcy Code. Enron also argues *682 that the safe harbor does not apply because its protection only extends to qualifying purchases and sales of securities, not to the payment or retirement of debt. Here, Enron argues, there was no trade or exchange of ownership of a security but, rather, the payment of a debt which extinguished the instrument. In addition, Enron contends that the safe harbor protection does not apply to the commercial paper because the question of whether it qualifies as a security, within the scope of section 546(c) of the Bankruptcy Code, is made by reference to the securities trade which does not recognize short-term commercial paper as a security. More specifically, Enron maintains that short-term, debt instruments, that are issued for the purpose of funding current operations and not for investment, are not commonly recognized as securities by the securities trade.
Enron concedes that a finding that there is an avoidable transfer is a predicate to its recovery, pursuant to section 550 of the Bankruptcy Code, or to the disallowance of defendants' other claims, pursuant to section 502(d) of the Bankruptcy Code. Enron, however, maintains that the Transfers are not protected from avoidance by the safe harbor provisions of the Bankruptcy Code and, therefore, can be recovered and that until the payments or their value are recovered, they form the basis upon which to disallow defendants' other claims. Enron, however, does not oppose the request of those Defendants who did not file a proof of claim to be excluded from Enron's disallowance claim under section 502(d) of the Bankruptcy Code.[4]
A hearing on this matter was held before the Court on September 21, 2004.[5]

DISCUSSION
FED.R.CIV.P. 12(b)(6) is incorporated into bankruptcy procedure by FED. R. BANKR.P. 7012(b). In considering a FED.R.CIV.P. 12(b)(6) motion to dismiss for failure to state a claim for relief, the court accepts as true all material facts alleged in the complaint and draws all reasonable inferences in favor of the plaintiff. Walker v. City of New York, 974 F.2d 293, 298 (2d Cir.1992). The motion to dismiss is granted only if no set of facts can be established to entitle the plaintiff to relief. Id.
In considering such a motion, although a court accepts all the factual allegations in the complaint as true, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 106 S.Ct. 2932, 2944 92 L.Ed.2d 209 (1986). Thus, where more specific allegations of the complaint contradict such legal conclusions, "[g]eneral, conclusory allegations need not be credited." Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1092 (2d Cir.1995). Rather, to withstand a motion to dismiss, there must be specific and detailed factual allegations to support the claim. Friedl v. City of New York, 210 F.3d 79, 85-86 (2d Cir.2000).
"Although bald assertions and conclusions of law are insufficient, the pleading standard is nonetheless a liberal one." Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir.1998). Pursuant to FED.R.CIV.P. 8(a), which is made applicable to adversary proceedings by FED. R. BANKR.P. 7008, in asserting a claim, the pleader need only set forth a short and plain statement of the claim showing that the pleader is entitled *683 to relief. The purpose of the statement is to provide "fair notice" of the claim and "the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). The simplicity required by the rule recognizes the ample opportunity afforded for discovery and other pre-trial procedures which permit the parties to obtain more detail as to the basis of the claim and as to the disputed facts and issues. Id. 355 U.S. at 47-48, 78 S.Ct. at 103. Based upon the liberal pleading standard established by FED.R.CIV.P. 8(a), even the failure to cite a statute, or to cite the correct statute, will not affect the merits of the claim. Northrop v. Hoffman of Simsbury, Inc., 134 F.3d 41, 46 (2d Cir.1997). In considering a motion to dismiss, it is not the legal theory but, rather, the factual allegations that matter. Id.
In reviewing a FED.R.CIV.P. 12(b)(6) motion, a court may consider the allegations in the complaint; exhibits attached to the complaint or incorporated therein by reference; matters of which judicial notice may be taken; Brass v. Am. Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir.1993); and documents of which plaintiff has notice and on which it relied in bringing its claim or that are integral to its claim. Cortec Indus. v. Sum Holding, L.P., 949 F.2d 42, 48 (2d Cir.1991). However, mere notice or possession of the document is not sufficient. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir.2002). Rather, a necessary prerequisite for a court's consideration of the document is that a plaintiff relied "on the terms and effect of a document in drafting the complaint." Id. As such, the document relied upon in framing the complaint is considered to be merged into the pleading. Id. at 153 n. 3 (citation omitted). In contrast, when assessing the sufficiency of the complaint, the Court does not consider extraneous material because considering such would run counter to the liberal pleading standard which requires only a short and plain statement of the claim showing entitlement to relief. Id. at 154. Nevertheless, in considering a Rule 12(b)(6) motion, a court may consider facts as to which the court may properly take judicial notice under FED.R.EVID. 201. In re Merrill Lynch & Co., Inc., 273 F.Supp.2d 351, 357 (S.D.N.Y.2003), citing, Chambers, 282 F.3d at 153.
To survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove them. Koppel v. 4987 Corp., 167 F.3d 125, 133 (2d Cir.1999). A court's role in ruling on a motion to dismiss is to evaluate the legal feasibility of the complaint, not to undertake to weigh the evidence which may be offered to support it. Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir.1998).
Thus, for the purposes of the Motion to Dismiss, the Court accepts as true all of the material allegations in the Plaintiff's complaint.[6]

*684 The Safe Harbor Provisions

Section 546 of the Bankruptcy Code provides a "safe harbor" for certain types of transactions. The purpose of section 546 is "to protect the nation's financial markets from the instability caused by the reversal of settled securities transactions." Kaiser Steel Corp. v. Charles Schwab & Co., Inc. (In re Kaiser Steel Corp.), 913 F.2d 846, 848 (10th Cir.1990) (hereinafter, "Kaiser I").
The routine purchase and sale of a security includes two opportunities for settlement, "street-side settlement" between the brokers and the clearing agencies and "customer-side settlement" between the broker and its customer. See Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.), 952 F.2d 1230, 1237-38 (10th Cir.1991) (hereinafter "Kaiser II"). The proper functioning of the system depends on the "guarantees of performance made by all the parties in the chain affirming that they will honor their obligations despite a default by another party in the system." See Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.), 263 B.R. 406, 476 n. 47 (S.D.N.Y.2001).
In the securities industry, "any transfer of cash or securities made to complete a securities transaction is considered a settlement payment." Walsh v. The Toledo Hosp. (In re Fin. Mgmt. Scis., Inc.), 261 B.R. 150, 154 (Bankr.W.D.Pa.2001). A settlement payment is a payment made to discharge a settlement obligation. Kaiser II, 952 F.2d at 1238 (citing Division of Market Regulation, Securities and Exchange Commission, The October 1987 Market Break at 10-5 (1988) (SEC Report)).
In enacting the section 546(e) exception to the avoidance powers, the goal was to preserve the stability of these settled transactions to the extent that they are not fraudulent as defined in section 548(a)(1)(A) of the Bankruptcy Code. Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.), 263 B.R. 406, 477 (S.D.N.Y.2001). If settled transactions could be reversed, it would undermine confidence in the system of guarantees and could lead to the "ripple effect" of bankruptcy filings by other participants in the chain of guarantees. Id. The purpose of section 546(e) of the Bankruptcy Code was "to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." Jewel Recovery, L.P. v. Gordon, 196 B.R. 348, 353 (N.D.Tex.1996) (quoting, H. Rep. No. 420, 97th Cong.2d Sess. 1 (1982), reprinted in 1982 U.S.C.C.A.N. 583).
When first enacted, section 546 of the Bankruptcy Code only applied to commodities market, however, in 1982, its scope was expanded to protect the securities market. Kaiser I, 913 F.2d at 848-49. Section 546(e) of the Bankruptcy Code provides that
Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.
11 U.S.C. § 546(e).
Section 548(d)(2)(B) of the Bankruptcy Code provides, in relevant part, that
a . . . stockbroker, financial institution, or securities clearing agency that receives a . . . settlement payment, as defined *685 in section . . . 741 of this title, takes for value to the extent of such payment.
11 U.S.C. § 548(d)(2)(B).
Thus, section 546(e) and section 548(d)(2)(B) provides a safe harbor for settlement payments. In connection with the securities trade, "settlement payment" is defined in section 741(8) of the Bankruptcy Code which provides that:
"settlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.
11 U.S.C. § 741(8).
In Enron Corp. v. Bear Stearns Int'l Ltd. (In re Enron Corp.), 323 B.R. 857, 865 (Bankr.S.D.N.Y.2005), this Court considered the arguments concerning the breadth of the term "settlement payment" and concluded that because the definition merely lists types of settlement payments, the reference in section 741(8) to "or any other similar payment commonly used in the securities trade" provided a basis upon which to get around the circularity of the definition and discern the meaning of the term "settlement payment." Id. at 870. In Kipperman v. Circle Trust F.B.O. (In re Grafton Partners, L.P.), 321 B.R. 527, 538 (9th Cir. BAP 2005), the bankruptcy appellate panel determined that the clause made clear that to come within the definition, the payment must be "restricted to the securities trade and must be `commonly used.'" Id.
Even where a broad interpretation has been ascribed to the term "settlement payment," it has been observed that the term had to be interpreted as it was "plainly understood within the securities industry." See Kaiser II, 952 F.2d at 1237; see also, Official Comm. of Unsecured Creditors v. Asea Brown Boveri, Inc. (In re Grand Eagle Cos., Inc.), 288 B.R. 484, 492 (Bankr.N.D.Ohio 2003) (noting that the term settlement payment has been characterized as a technical word or term of art which requires reference to the industry usage of the term at the time of enactment); Adler, 263 B.R. at 475 (noting that it is clear that the provision is to be "defined with reference to the common understanding, practice and usage in the securities industry"). As such, to discern whether a payment is protected by the safe harbor provisions, a court must examine the operation of trades in the securities industry. Grafton, 321 B.R. at 538.
The transactions at issue were made prior to the maturity date of the Commercial Paper and contrary to the terms of the pertinent Offering Memorandum, which prohibited prepayment. Moreover, Enron has alleged that the payments were made at par, which was significantly more than the prevailing market price at the time of the Transfers. Enron maintains that early redemptions and prepayments are rare in the Commercial Paper market, especially when contrary to governing documents and at prices significantly higher than the prevailing market price, and therefore are unique and cannot be considered common in the securities industry. As the payments were contrary to the parties' intentions at the time of the issuance of the offering documents, Enron argues that the Transfers were not to settle securities trades but, rather, were to prepay debt similar to the manner in which any borrower repays the principal and interest on a loan. At a minimum, Enron argues that evidence must be presented for the Court to determine whether the prepayment of commercial debt is ordinary or routine.
The Court concludes that because the § 546(e) safe harbor only protects *686 from avoidance those settlement payments that are "commonly used in the securities trade" and because, on a motion to dismiss, the Court must accept Enron's allegations as true, evidence must be presented as to whether payments made with respect to short-term commercial paper prior to the maturity date, at significantly above market prices and contrary to the offering documents in the midst of coercion by the holders of the commercial paper resulting from public announcements that make clear that the company is in a severe financial crisis constitute settlement payments commonly used in the securities trade.[7] Thus, evidence must be presented as to whether this "particular transaction" could be "`normally regarded' as part of the settlement process." Grafton, 321 B.R. at 540, citing, Adler, 263 B.R. at 431. Moreover, as noted by the Grafton court, the "decisions that involve outright illegality or transparent manipulation reject § 546(e) protection." Grafton, 321 B.R. at 539. Thus, evidence must be presented on the issue of whether the Transfers were the result of the defendants' manipulation.
Further, evidence is also necessary as to whether the Transfers were made to retire and extinguish the debt or to trade the securities. If the payments were made to retire the debt, the Court would need to address the issue of whether such payments  which were not then for the purchase, sale or loan of securities but were to satisfy the underlying debt obligation  are nonetheless settlement payments for purposes of § 546(e).
In opposing the constructive fraud claims, certain Defendants argue that the transfers were made for value, because they retired antecedent debt. This argument, however, is premature. First, a trial is required to resolve the factual issue of whether the Transfers were made to repurchase the Notes or to retire the debt represented by the Notes. At that juncture, if the Court concluded that the Transfers were made to repurchase the Notes, then there would be no transaction involving the payment of an antecedent debt to which to apply the "transfer for value" argument. Nevertheless, even upon such a finding, the Court would yet have to address the issue of whether the short-term commercial paper at issue qualifies as a security within the scope of section 546(e) of the Bankruptcy Code. The Court, however, would not have to address this latter issue if it were determined that the Transfers were made to retire the debt represented by the Notes.[8]

*687 CONCLUSION

The Court concludes that to qualify as a settlement payment protected by section 546(e) of the Bankruptcy Code from avoidance, the payment must be common in the securities trade. This is a factual issue requiring a trial. Further, evidence is required on whether the Transfers were a result of the defendants' manipulation. Therefore, the defendants' request for dismissal of the adversary proceedings at this stage should be denied.
If, after trial, it is found that the payments were to retire and extinguish the debt, the Court would need to address the issue of whether such payments qualify as settlement payments for purposes of § 546(e).
Further, the Defendants' arguments with respect to "transfer of value" concerning the constructive fraud claims are premature as a trial is required to resolve the factual issue of whether the Transfers were made to repurchase the Notes or to retire the debt represented by the Notes. This is because if the Transfers were to purchase the Notes, there would be no antecedent debt to which to apply the value argument.
In addition, even if the payments were to repurchase the Notes, the Court would have to address the issue of whether the short-term commercial paper at issue qualifies as a security within the scope of section 546(e) of the Bankruptcy Code.
Counsel for the Debtors is to settle an order consistent with this Court's Memorandum Opinion.
NOTES
[1] The J.P. Morgan defendants are J.P. Morgan Securities Inc.; Goldman, Sachs & Co.; Lehman Commercial Paper Inc.; Allstate Life Insurance Company; DNB Asset Management (US), Inc., formerly known as Skandia Asset Management Inc.; UBS Global Asset Management (Americas) Inc., formerly known as Brinson Partners, Inc.; UBS Short-Term Relationship Fund, also known as BRF Short Term Fund; UBS Global Allocation Fund, also known as Global FD SEC; GMDD; Banco CentroAmericano de Integracion Economica, also known as Central American Bank for Economic Integration and 148621 Cabie A; Banco de Guatemala, also known as 148520 Banco Guatemala; UBS Global Securities Relationship Fund, also known as BRF GSP SEC Lending; UBS Global Asset Management (New York) Inc., also known as UBS Brinson; Saltash Enterprises; Harald and Joann McPike; J.P. Morgan Chase Bank N.A.; The Northern Trust Company; Kamilche Company; Collective Short Term Investment Fund of the Northern Trust Company; PIC Realty Company; Prudential Insurance Company of America; Prudential Plan-Futures Investment Fund; FRU/General Lending Collateral Acct. # PIC00006; Prudential Capital Management; Prudential International Insurance ABS Fund; PRU/PHMCMM/PIC00183; Prudential International Insurance High Yield Fund; Prudential Home Mortgage Co., Inc.; Prudential Merged Retirement Plan; US BanCorp Investments, Inc; FBS Investment Services; EchoStar Communications Corporation; Winco Foods Inc.; ElectroImpact Inc.; J.P. Morgan Securities of Texas, Inc., formerly known as Chase Securities of Texas, Inc.; Wilmington Trust Company; New Castle County; The Belo Company; GMP Companies, Inc.; Capital Assurance Company, Inc., also known as CAP Assur Co.; Marlon Management Services, Inc., also known as Marlon Insurance Company Ltd.; Brahms Funding Corporation; Dresdner Bank AG; Lehman Brothers International (Europe); Merrill Lynch Investment Managers, L.P., formerly known as Merrill Lynch Asset Management; Mitsubishi Trust and Banking Corporation; Merrill Lynch Tanchuki Bond Open Mother Fund; Menlo Life Insurance Co,; Fremont General Corp.; Fremont Indemnity Co.; Fremong Pacific Insurance Co.; Abercrombie & Fitch Co., also known as Abercrombie & Fifth; Abercrombie & Fitch Stores, Inc.; Abercrombie Fitch Management Co.; Institutional AIM Floating Rate Fund; Inverban S.A., also known as Inverbank S.A. HIC; San Faustin N.V.; Techint Financial Corporation Ltd.; Techint Curacao N.V.; Techint Investments N.V.; Techint Limited; Cascade Investments LLC; Cascade Driver Account-Larson Banco National de Mexico; Kelly Properties, Inc.; Aetna Inc.; Healthcare-Carolinas; US Health Care (N.Y. Health Care Plan Mid-Atlantic); Aetna Services Inc.; U.S. Healthcare of Pa.; Healthcare of Connecticut; Lion Connecticut Holdings Inc., formerly known as Aetna Life & Casualty; Health Plans of Texas; Health Plans of Florida; Frontier Health Plans; Health Plans of Arizona; Short Term Pool; Health and Life Insurance Co. Investment Croup; Banca Serfin S.A.; Charles Schwab Investment Management, Inc.,; Schwab Yield Plus Fund Money Market Fund Dept.; Banco Provincial Overseas, N.V.; Banco Espirito Santo, S.A., formerly known as Banco Espirito Santo & Commercial de Lisboa S.A., New York Branch; Scott & White Memorial Hospital Scott & White Clinic; Scott, Sherwood and Brindley Foundation; Fiserv Securities, Inc.; Lewis & Clark College; Dell Computer Products Europe Ltd., also known as Dell Products Ireland; Mony Life Insurance Company, formerly known as The Mutual Life Insurance Company of New York; 31 Series Fund-Money Market; 05 Div Govt/Corp Bond Port; 10 Div Intermed Govt. Port; 06 Div Equity Income; 76 MONY CB Acct.; 84 Usfl Life Insurance Co.; 06 Div Equity Income; The Mony Group Inc.; 07 Pooled Account # 7; Citibank, N.A.; Citi Institutional U.S. Corporate & Mortgage Bond Fund; Mony Capital Management, Inc.; Enterprise MM Portfolio, Acct. # 29; The Enterprise Money Market Portfolio; U.S. Financial Life Insurance Company (USFL); Enterprise Capital Management, Inc.; Diversified Investment Advisors, Inc.; Trusco Capital Management, Inc.; AXA Investment Managers, Inc. Also known as AXA Investment Managers North America, Inc.; AXA Court Terme; AXA IM EURO Liquidity; Fleet Capital Markets, a division of Fleet Securities, Inc.; Fleet National Bank; Analog Devices Inc.; UBS AG; Thrivent Financial for Lutherans Investment Dept.; AAL Savings Plan International Money Market Investment Department; Mitsubishi Tokyo Financial Group; Brown Forman Corp.; Longnorth Ltd; TMS Bridge; ALFA, S.A. de C.V.

The Mass Mutual Defendants are Mass Mutual Life Insurance Co.; J.P. Morgan Securities Inc.; Goldman Sachs & Co.; David L. Babson & Company, Inc.; MTB Investment Advisors, Inc. f/k/a Allied Investment Advisors Inc.; Bank One Ohio Trust Company; Mass Mutual Prime Fund; CM Life Surplus Inv. Account; Mass Mutual Holding Co.  Seg. 83; Mass Mutual Core Bond Fund; CIA Internal Hedge Fund; Mass Mutual Balanced Fund; Mass Mutual Life Ins. Co. Gia Pooled Short Term Inv.; Mass Mutual; Investors Bank & Trust; The Northern Trust Company; American Society of Anesthesiologists; American Bar Endowment; American Dental Hygienists Associates; the Rock Foundation; Arthur Rock, Trustee of the Rock 1994 Charitable Remainder Unitrust Dtd 12/21/94; The Aragon Group Inc.; Jay H. Baker  Personal Account; Ridgestone Corporation; Merrill Lynch The Center for Radiation Therapy; Chicago Zoological Society  General Fund; Richard & Helen Devos Foundation; Jerry L. and Marcia D. Tubergen Foundation; Guilford Glazer, Trustee of the Guilford Glazer Trust of 1984 Dated May 15, 1984; Sengar; Bulc Limited Partnership; Northern Trust Bank of Texas, Agent for the Estate of Ruth Ray Hunt  Mt Vernon SP. Agency Adv. Account; William I. Koch  Cash Account; Michael P. Krasny, Trustee of the Michael P. Krasny Revocable Trust Dated July 1, 1993; Edward T. McGowan, Mid Oaks Investments LLC, Furman C. Moseley & Susan R. Moseley, Coling Moseley, Eleanor M. Pollnow and Francisca M. Johnson, Co-Trustees of the Qualified Personal Residence Trust for Furman C. Moseley U/A December 30, 1992; Neal Family Foundation; Neal Family Revocable Family Trust; Douglas C. Roberts Trust; David K. Roberts Trust Dtd 9/27/89; Steven S. Roberts Trust Dtd 9/27/89; Jeffrey K. Roberts Trust Dtd 9/27/89; Seattle Center Foundatin for McCaw Hall Campaign-Kreielsheimer; S. York and T. Torino, Co-Trustees of the Francis P. Torino Living Trust; Walton Enterprises II, LP; Mark White and Dana White Shea, Trustees of the Mark White Exempt Trust; Verisign, Inc.; University of Florida Foundation; Nuclear Electric Insurance LTD.; Collective Short Term Investment Fund of the Northern Trust Company; Merrill Lynch Investment Managers, L.P., formerly known as Merrill Lynch Asset Management; 7ME4-GM Cash Mgmt Master Trust; GMAM Investment Funds Trust, A Successor to General Motors Employees Global Group Pension Trust; General Motors Corporation; General Motors Investment Management Corporation; The General Motors Hourly-Rate Employees Pension Plan; The General Motors Retirement Program for Salaried Employees; The G.M. Special Pension Plan; Promark Enhanced Income Fund; General Motors Trust Company; State Street Bank & Trust Company; Nomura Asset Management USA Inc.; Nomura Bond Select Trust L-BST; Global Fund Management S.A.; Nomura Bank (Luxembourg) S.A.; The Bank of New York Company, Inc.; Blackrock Capital Management, Inc.; Deutsche Bank Securities, Inc., formerly known as Deutsche Banc Alex, Brown Inc.; Veritas Software Investment Corp.; Wilmington Trust Company; New Castle County; General Motors Welfare Benefit Trust; Enhanced Libor Plus; The Rock 1994 Charitable Remainder Unitrust Dated 12/21/94; The Guilford Glazer Trust of 1984 Dated May 15, 1984; The Estate of Ruth Ray Hunt; The Michael P. Krasny Revocable Trust Dated July 1, 1993, The Qualified Personal Residence Trust for Furman C. Moseley U/A December 30, 1992; The Francis P. Torino Living Trust; The Mark White Exempt Trust; Aeltus Investment Management Inc.; AIAF Equity 31R-500; ING VP Balanced Portfolio, Inc.; Lehman Commercial Paper Inc.; and AETNA Bond VP (AIS).
[2] The approximate accrued par value paid was the price originally paid for the commercial paper plus accrued interest.
[3] Several of the defendants filed pleadings indicating that they joined in the motions to dismiss filed by others and certain of those defendants filed their own motions to dismiss in addition to joining in the motions filed by others. Also, a few defendants filed their motions to dismiss subsequent to February 18 or 19, 2004.
[4] Enron, however, does oppose such relief with respect to Banco Espirito Santo which, according to Enron, did file a proof of claim contrary to the assertion in its motion.
[5] Pursuant to various stipulations and orders entered by the Court, certain of the defendants have been dismissed from these adversary proceedings.
[6] The Defendants attached a copy of the Confirmations to their motion and contend that even though Enron did not attach them to the Complaint, it relied on them in formulating the Complaint and therefore, the Confirmations can be considered by the Court. Enron argues that the Confirmations were not integral to the Complaint and that Enron only used them to ascertain the names of the parties to sue and the amounts of the trades. The Court finds that whether or not it considers the Confirmations is irrelevant to the outcome of this motion to dismiss because the characterizations of the transaction in the Confirmations are not dispositive. The Confirmations were created by the defendants without any input from or ratification by Enron. Under the circumstances present here, Enron cannot be bound, on a substantive basis, by the descriptions of the transactions contained in the Confirmations.
[7] The Defendants argue that even assuming that the "commonly used in the securities trade" phrase modifies all of the entries in § 741(8), it is the payment itself and not the transaction that must be common in the securities trade and that payment of money must be considered common in the securities trade. The Court, however, concludes that the analysis is not as narrowly focused as suggested by the Defendants. Rather, it is the payment as associated with the transaction that must be considered as a whole in determining whether the settlement payment is common in the securities trade.
[8] As a preliminary matter, certain of the foreign defendants alleged that they have insufficient contact with the forum to warrant a finding that they are subject to personal jurisdiction. For the reasons argued by Enron, including that the causes of action in the Complaints stem from the commercial paper transaction which the defendants conducted here, either directly or through an agent, the Court concludes that, at least for the purposes of the motion to dismiss, Enron has made a prima facie showing of the minimum contacts required to support specific jurisdiction over those defendants.

The Court has also considered the other arguments raised by certain Defendants in support of their respective motions to dismiss and finds them insufficient to warrant dismissal of the Complaints.